ADAMSON et ux. v. BROCKBANK et al.

No. 6991. Decided October 3, 1947. (185 P. 2d 264.)

See 26 C. J. S. Deeds, sec. 210. Unilateral mistake as basis of bill in equity to rescind the contract, see note, 59 A. L. R. 809. See also, 9 Am. Jur. 377. Implied easement in respect of drains, pipes, or sewers upon severance of tract, see note 58 A. L. R. 824. See also, 17 Am. Jur. 953.

*D. Eugene Livingston,* of Salt Lake City, for appellants.

*Christenson & Christenson,* of Provo, for respondents.

LATIMER, Justice.

Before treating the merits of this controversy, it is necessary to rule on and dispose of a motion to dismiss the appeal interposed by plaintiffs after the case had been argued on the merits.

Judgment for the plaintiff was given by the Trial Court on March 29, 1946. A motion for new trial was timely filed and was overruled by the court on May 17, 1946. On June 2, 1946, plaintiffs served on defendants a notice that on the 22nd day of June, 1946, counsel would move the court for an order amending the judgment and decree incertain particulars.

In the original judgment entered by the court the plaintiffs were awarded judgment in the sum of $3,351.34 against the defendants Alan E. Brockbank, Qualie Rich Brockbank, and the Federal Homes, Inc. In the latter part of the judgment the court dismissed the complaint as against 22 defendants including the defendant Federal Homes, Inc. This resulted in an inconsistency in the judgment with respect to the Federal Homes, Inc.

Plaintiffs' motion herein referred to was to strike the name "Federal Homes, Inc." from the latter portion of the decree due to inadvertence and a clerical mistake in including this defendant with those defendants who were otherwise dismissed.

On June 23, 1946, the court entered an order granting the motion to strike the name "Federal Homes, Inc." from the latter part of the decree and by this order eliminated the inconsistency in the judgment.

The record is silent as to what parties were present at the time of the hearing on the motion, so it is impossible to determine whether or not it was resisted. However, in addition to amending the judgment the court directed the amendment be entered nunc pro tunc so as to appear on the records as of the date of the original judgment.

The notice of appeal was served and filed within 90 days from the date of entry of the nunc pro tunc order but was not within 90 days from the date of the overruling of the motion for new trial. The question, therefore, presented by the motion to dismiss is this. Did the 90 day time for appellants to serve and file their notice of appeal begin running as of the date the motion for new trial was overruled or did it start to run from the date the nunc pro tunc order was entered?

Even though the motion to dismiss the appeal was made after the case was argued on its merits, this court will, on its own motion, determine lack of jurisdiction when the appeal is not taken in time, where such want of jurisdiction appears on the face of the record. *Dixie Stockgrowers' Bank* v. *Washington County*, 81

Utah 429, 19 P. 2d 388. Contrary to appellants' contention, respondents' motion was not too late.

The right to an appeal is a valuable and constitutional right and ought not to be denied except where it is clear the right has been lost or abandoned. See *Boucofski et al* v. *Jacobsen et al.*, 36 Utah 165, 104 P. 117, 26 L. R. A., N. S., 898. The test in the case under consideration is whether or not this right of appeal has been lost.

While different results have been reached in other jurisdictions, the cases of *Lukich* v. *Utah Construction Co.*, 48 Utah 452, 160 P. 270, and *Cody* v. *Cody*, 47 Utah 456, 154 P. 952, settle the law in this state, as to this question. The rule of law enunciated by this court in these cases, is that, where a belated entry merely constitutes an amendment or modification not changing the substance or character of the judgment, such entry is merely a nunc pro tunc entry which relates back to the time the original judgment was entered, and does not enlarge the time for appeal; but where the modification or amendment is in some material matter, the time begins to run from the time of the modification or amendment. See also, *Obradovich* v. *Walker Brothers Bankers*, 80 Utah 587, 16 P. 2d 212.

The modification or amendment in this case changed an inconsistent judgment to one of consistency, rendering the defendant Federal Homes, Inc., liable when there was previously some doubt existing as to its liability. In the opinion of the members of this court, this was of sufficient importance to change the character of the judgment. The order amending the judgment was a modification of a material matter and enlarged a right running to the plaintiff. While the court may have had authority to enter the order nunc pro tunc, it could not create a right where none existed, or alter an existing right and, by an antedated order, cut down appellants' time in which to appeal. The effect of the amendment was to create a new judgment for purposes of appeal, and the time in which

an appeal could be taken commenced to run from the date of the entry of the nunc pro tunc order.

This opinion does not treat the rights of the defendants separately. The pleadings, trial, judgment and appeal of the parties all treat the judgment against the Brockbanks and the Federal Homes, Inc., as joint and not as joint and several. Therefore, no opinion is expressed on the question of the effect of a nunc pro tunc order on parties not affected by the order, where several liability exists.

The motion to dismiss is denied.

Passing now to the merits of the case, the issues between the parties in the action arose out of the destruction by appellants of an irrigation ditch used by respondents to carry water to respondents' property located in Utah County, State of Utah. Prior to the time the respondents and appellants purchased their interests, the property was known and designated as the "Chipman Farm." For all practical purposes the prior owners were the trustee-executors of the estate of James Chipman, deceased.

For more than 30 years prior to the time the property was divided and sold to these litigants, there had been an irrigation ditch crossing the farm. This ditch had been in continuous use for the 30-year period in irrigating certain portions of the farm including that portion purchased by respondents. On May 23, 1942, the trustee-executors sold and conveyed to respondents a 10-acre portion of the farm. The conveyance was by warranty deed; however, no mention was made in this deed as to the reservation of any right over and across the property retained by the Chipman estate.

There is evidence that prior to closing the transaction with respondents, one of the trustees went over the property with respondent, Thomas W. Adamson, and pointed out the ditch through which the water must flow to irrigate the tract of land being purchased by him. Subsequent to the sale to respondent, and on the 22d day of October, 1942, the trustee-executors sold to the appellants, Alan E. Brockbank and Gaylie Rich Brockbank, a portion of the farm contiguous to and immediately east of the property previously

conveyed to the respondents. Appellants Alan E. Brockbank and Gaylie Rich Brockbank conveyed the property in turn to the appellant, Federal Homes, Inc., a corporation which they caused to be organized, and in which they were officers, directors, and stockholders. Appellants also caused the land to be subdivided and designated the subdivision "Columbia Village."

There is further evidence that prior to the time appellants purchased the property, appellant, Alan E. Brockbank, was taken over the property, walked along the ditch in question, was on a number of occasions in the immediate vicinity of the ditch, and, while he testified he had no knowledge of the ditch, the weight of the evidence and the finding of the court is to the contrary. During the time of Alan E. Brockbank's visits to the property, the ditch was being used by respondents to carry water to their land. The ditch was from two to four feet wide and from one to two feet deep, the banks were well defined and, from the weight of the evidence, it clearly appears the purposes and use of the ditch were readily observable to any one going onto the land.

Between the latter part of February, 1943, and April, 1943, the appellants, in subdividing the property and constructing homes thereon, destroyed the ditch and thereby prevented respondents from bringing water through the ditch to their property.

Respondents' evidence is to the effect that due to the slope of the ground, it was necessary, in order to irrigate their property, to have the use of this particular ditch. Appellants' evidence was that a ditch might be constructed over a different route but this would involve the construction of levels or embankments of undetermined cost. The court resolved this question of fact in favor of respondents and found that the crossing of appellants' ground was a way of necessity.

On the 19th day of February, 1943, and prior to the time appellants destroyed the ditch, respondents executed and delivered to the appellants a quitclaim deed to the property

purchased by appellants. The facts and circumstances surrounding the execution of this deed are detailed more fully in the portion of this opinion dealing with the effect of the deed.

The court awarded respondents a judgment for their damages resulting from the destruction of the ditch, and also decreed cancellation of the quitclaim deed insofar as it affected the rights of appellants. Other defendants were involved in the action until completion of the trial, at which time the court dismissed the complaint as to all excepting these appellants. The rights of the dismissed parties are no longer involved in this action.

It is necessary to discuss three questions to dispose of this appeal. These are: (1) Did respondents by their purchase from the trustee-executors acquire a right to the use of the ditch across appellants' property? (2) If such a right was acquired, did the execution of the quitclaim deed by respondents convey away any such acquired interest? And (3) Was the measure of damages as awarded by the court proper and were the damages supported by the evidence? We shall treat these questions in the order stated.

If the judgment can be sustained it must be upheld on the theory that respondents acquired an easement over appellants' property by implication, inasmuch as no express reservation was made in the deed to appellants, and no words of grant were included in respondents' deed.

Appellants place reliance on the rule of law that when the language of the instrument is clear and unambiguous, the intent of the parties is determined solely by the terms of the document, and cite in support thereof the case of *Ruthrauff et al.* v. *Silver King Western Mining Company et al.*, 95 Utah 279, 80 P. 2d 338. With this general rule of law we have no dispute. However, the rule is not applicable in the present action. Section 78-1-11, U. C. A., 1943, provides that a deed in statutory form shall have the effect of a conveyance in fee simple to the grantee, of the premises therein named, together with the appurtenances thereunto belonging. If a deed by statute has the

effect of passing all appurtenances to the property, then it is not varying the terms of a written instrument to establish what was appurtenant to the property. To hold to the contrary would render the quoted statute nugatory.

This is not a suit where innocent parties have been misled by public records, by acts and conduct of the parties, or by reliance on representations made. This is a suit to determine the rights created between grantors and grantees, all of whom knew or should have known that rights not entirely reflected by recorded deeds were in existence. All parties who subsequently acquired the property, without either actual or constructive notice, have been dismissed from the action. The only ones remaining are those parties who had or were charged with knowledge.

In dealing with creation of easements by implication, the Restatement of the Law, Section 476, states on page 2978:

"An easement created by implication arises as an inference of the intention of the parties to a conveyance of land. The inference is drawn from the circumstances under which the conveyance was made rather than from the language of the conveyance. To draw an inference of intention from such circumstances, they must be or must be assumed to be within the knowledge of the parties. The inference drawn respresents an attempt to ascribe an intention to parties who had not thought or had not bothered to put the intention into words, or perhaps more often, to parties who actually had formed no intention conscious to themselves. In the latter aspect, the implication approaches in fact, if not in theory, crediting the parties with in intention which they did not have, but which they probably would have had had they actually forseen what they might have foreseen from information available at the time of the conveyance * * *."

The Restatement of the Law sets out certain factors to assist in determining whether the circumstances under which a conveyance of land is made imply an easement. While the list of factors therein quoted is not exhaustive, the following are set forth as relevant. Restatement of the Law of Property, paragraph No. 476, page 2977:

"In determining whether the circumstances under which a conveyance of land is made imply an easement, the following factors are important:

(a) Whether the claimant is the conveyor or the conveyee,

(b) The terms of the conveyance,

(c) The consideration given for it,

(d) Whether the claim is made against a simultaneous conveyee,

(e) The extent of necessity of the easement to the claimant,

(f) Whether reciprocal benefits result to the conveyor and the conveyee,

(g) The manner in which the land was used prior to its conveyance,

(h) The extent to which the manner of prior use was or might have been known to the parties."

Before treating the decided cases, it is well to test the facts of this case by the above stated factors we consider of importance to the decision. (a) The claimants here are the conveyees and therefore doubts in construing the conveyance should be resolved in their favor. (c) The purchase price of the property is shown and the testimony of Mr. Adamson indicates the use and value of the water were taken into consideration at the time of the purchase. The deed itself sets forth a substantial payment for the property, and such consideration infers an intent to transfer rights and privileges necessary to prevent the land from immediately becoming valueless. (e) The court found and the evidence clearly indicates that the use of the ditch by respondents was necessary to the proper use of the land for the purposes for which it was purchased. The property was purchased by respondents for farming purposes, and without the use of the ditch the land could not be effectively used. The grantors in this case well knew that without water, the land was of questionable value for farming uses, and the evidence supports the court's finding that it was not feasible to bring water to the land over a course different from the one already existing at the time of purchase. (g) The land had been used for growing irrigated crops prior to the time it was conveyed to respondents, and the evidence is to the effect that it was contemplated by the trustees and by the respondents to be and was used in the

same manner after respondents became the owners. No evidence was presented that, as between respondents and the grantors, any change in use was contemplated. (h) As between the grantors and these respondents, the record shows that the manner of prior use was continuous, open, extensive, and well known, and that appellant, Alan E. Brockbank, knew of such use prior to his purchase.

Cases involving similar facts and issues have been before this court on previous occasions. One of the earliest cases touching on similar principles is *Fayter* v. *North,* 30 Utah 156, 83 P. 742, 6 L. R. A., N. S., 410. The facts are similar to the facts in this action and the reasoning persuasive. Appellant, there as here, raised the question of the possibility of an owner's having an easement over his own land. Said the court, at page 170 of 30 Utah, at page 746 of 83 P., 6 L. R. A., N. S., 410:

"* * * It is insisted, however, for the appellants, that the owner could not create an easement in his own land, and that, so long as the grantor owned what are now claimed to be the servient estate and the dominant estate, his use of one for the benefit of the other was a mere exercise of a right of property over his own land, and in no sense an easement. Whether or not the artifical arrangement of the material properties of his estate by the owner, constituted a technical easement is, under the facts and circumstances of this case, immaterial. It clearly created a condition to the land sold partaking of the character of an easement, constituting at least a quasi easement, visible to the purchaser, and one of the things in the minds of the parties when the bargain of sale was made. The contract of sale was made with reference to it as a part of the subject-matter, and was thus treated as, and in fact became, quasi appendant to the land sold, and the vendor could not thereafter derogate from his own grant. The presumption of law is that the parties contracted with a view to the condition of the property as it actually was at the time of the transaction, and after sale neither one had a right, without the consent of the other, to change that condition, which openly and visibly existed, to the detriment of the other. The deed conveyed the land with all the benefits and burdens appendant or quasi appendant thereto, and the vendee could neither shake off the burdens nor could the vendor take away the benefits that were open and visible at the time of sale."

Again, in the case of *Rollo* v. *Nelson,* 34 Utah 116, 124, 96 P. 263, 265, 26 L. R. A., N. S., 315, this court dealt with

the subject of implied easements. Chief Justice McCarty, speaking for the court, reaffirmed the holding of *Fayter* v. *North,* and said:

"The most important question, however, in this case is, did the easement in and to the cement walk pass as an appurtenance to the lots purchased by appellants? This question must be answered in the affirmative; for it is a well-recognized rule of law that, on a severance of an estate by a sale of a part thereof, all easements of a permanent character, that have been created in favor of the land sold, and which are open and plain to be seen, and are reasonably necessary for its use and convenient enjoyment, unless expressly reserved by the grantees, pass as appurtenances to the land. * * * This doctrine is tersely, and, as we think, correctly stated in the case of *Phillips* v. *Phillips,* 48 Pa. 178, 86 Am. Dec. 577. In the syllabus of the opinion it is said: 'Servitudes, adopted by the owner of land, which are plainly visible or notorious, and from the character of which it may fairly be presumed that he intended their preservation as necessary to the convenient enjoyment of his property, become, when the lands are divided and pass into other hands, permanent appurtenances thereto, and the owner of neither the domnant nor servient portions of the land has power adversely to interfere with their proper use and enjoyment'."

Both parties refer to the case of *Morris* v. *Blunt, et al.,* 49 Utah 243, 161 P. 1127, but neither party touches on the principles of law in that case as they affect the issues in this action. The controlling element in that case can be found on page 254 of 49 Utah, on page 1132 of 161 P., where the following statements appear:

"An appurtenance implied upon a severance of title is referred to the intent of the grantor, and such intent is gathered from conditions existing at the time of severance of title and implied from such circumstances; and, in general terms, the rule may be stated that when the owner of a tract of land has arranged and adapted the various parts so that one derives a benefit and advantage from the other of a continuous and obvious character, and he sells one of the parts without making mention of the incidental advantage or burdens of one in respect to the other, there is implied an understanding and agreement that such advantages and burdens continue as before the separation of title. * * *

"The elements essential to constitute an easement by severance are: (1) Unity of title followed by severance; (2) That at the time of the

severance the servitude was apparent, obvious, and visible; (3) That the easement is reasonably necessary to the enjoyment of the dominant estate; and (4) It must usually be continuous and self-acting, as distinguished from one used only from time to time when occasion arises."

The case was decided against the grantee because of insufficient evidence to support a finding of necessity.

The next case in point of time was *La Bee* v. *Smith,* 64 Utah 242, 229 P. 88, 90. The facts as found by the trial court were these: At one time C. S. Kinney owned the parcels of land held by the litigants at the time of the trial. About 40 years prior to the trial, Kinney had constructed a ditch over the property including the lands purchased by plaintiff and defendant. Kinney sold his property in parcels to diverse persons and in each conveyance conveyed all water rights belonging to the land. In no case did Kinney subject the land of plaintiff to the said ditch nor did he grant to other purchaser the right to run water through the same. The ditch was conspicuous, could be seen by any one going onto plaintiff's farm, and had been in continuous use for a long time. Plaintiff sought to enjoin defendant from using the ditch for conveying water across plaintiff's land.

While the case deals mostly with the weight of the evidence the following quotation is pertinent:

"La Bee contends that, as both pieces of property were once owned by Kinney, Kinney could not acquire the prescriptive right for an easement for a ditch over a piece of his own land in favor of another, and when he sold the land claiming the easement, could not, therefore, convey the easement. Counsel does not cite any authority in support of this position, and we know of none. If the Y ditch had existed and been used by Smith and his predecessors in interest for 20 years, and was visible when the plaintiff purchased his property, as the court found, we know of no reason why such an easement would not pass with the title to the land to which it was appurtenant."

Shortly after the decision in the *La Bee case,* supra, this court again dealt with the question of implied easement. In *Alcorn* v. *Reading,* 66 Utah 509, 243 P. 922, it was held that

no easement could be implied under the facts of that case. The court took the opportunity to differentiate the case from the *La Bee* case, on two grounds. Firstly, the time element in the conveyances was reversed. That is, in the case then before the court, the one seeking to enforce the claim of implied easement had to trace his title to one who had acquired title after the time of acquisition by the party seeking to deny the easement. To enforce the right in the *Alcorn* case would be to permit the grantor to derogate from his grant rather than to enlarge it for the benefit of the grantee. This is a controlling difference, as the court went on to say, at page 514 of 66 Utah, at page 924 of 243 P.:

"If the order of making the conveyance by the Russon Investment Company to O'Brien and the respondent here were reversed, so as to give the respondent priority in point of time, the case of *Lampman* v. *Milks* [21 N. Y. 505, 507], supra, would be strongly in point. * * *."

Other material facts such as a change in the use of the estate from a farm to a subdivided village and lack of knowledge of prior use on the part of the other purchasers, either actual or constructive, were passed over by the court, inasmuch as the appeal was decided on the question of condemnation.

While the *Alcorn* v. *Reading* case is readily distinguishable from the other cases in this jurisdiction on other grounds previously referred to in this opinion, the court based its decision on the right of condemnation. We quote from the opinion as published on page 520 of 66 Utah, on page 926 of 243 P.:

"* * * We base our decision, however, upon the proposition that an easement for an irrigation ditch upon the theory of an implied reservation does not exist in this state, however necessary the easement may be, for the reason that the statute of eminent domain provides a complete remedy by proceedings in condemnation."

The statement of facts as given in the opinion of the case just referred to does not give a clear picture of how easy or how difficult it might have been to condemn a right

of way. Neither do the facts indicate what might have been the costs and expenses incident to such a procedure. It may have been that the topographical condition present in that case permitted the construction of a ditch with little or no cost, and over property of little or no value. Be that as it may, the evidence in the case at bar shows conclusively that to bring water in over a different course would require construction of levees and embankments to overcome the natural slope of the ground. Just what the cost of this construction would be is not disclosed by the record. However, the record does indicate that because of the contour of the ground and a ridge running through the property of respondents, a reasonable necessity exists for bringing the water to the land of respondents across the land purchased by appellants.

To follow the rule of law as announced in the above quoted portion of the case of *Alcorn* v. *Reading* would mean that regardless of necessity, a person could never acquire an easement by implication when the easement was for the purpose of conveying water, because a right of condemnation exists. To hold this to be the law would carry the doctrine of necessity far beyond that announced in any other case, and would destroy the principle that where one grants property to another he thereby grants him the reasonable and necessary means of enjoying it, whether expressed or not.

The various states have adopted different degrees of necessity, but the tendency in recent decisions is toward the concept that no more than a reasonable necessity is required. Cases in this jurisdiction prior to the case of *Alcorn* v. *Reading* seem to follow this principle. Such principles as "absolute necessity" and "indispensable necessity" have yielded to the rule that the necessity requisite to the creation of an easement by implication is sufficient if it is a "reasonable" necessity. (See 17 Am. Jur. page 943). If this test is applied, the rule of necessity in water cases is the same as in other cases.

The case at bar is illustrative of the reason why the right of condemnation does not nullify the doctrine of reasonable necessity. If the course to be condemned had to be constructed through Columbia Village, which is now built up with home, then the cost of obtaining the right of way might well exceed the value of the estate acquired by respondents. If it were not practical to construct the ditch through the village, it would be necessary for respondents to condemn and construct a ditch around the subdivision. That such condemnation might require the payment for other expensive properties is entirely possible and the cost of condemnation, together with additional construction costs, might prohibit recourse to this procedure.

To the extent that the case of *Alcorn* v. *Reading* holds there can be no easement by implied grant because of the right to condemn, it is overruled. The true test is the reasonable necessity existing therefor, and we reaffirm this principle. If an alternate way permits a grantee to make use of his land at little or no cost, the availability of this means might be a factor in determining the necessity of the easement. However, to infer an intent not to convey a right to the ditch only because a right to condemn exists, overlooks the fact that condemnation proceedings ofttimes involve expensive and uncertain litigation, and violates the principle that the inference of intention must be drawn from all the circumstances under which the conveyance is made, and not from one alone.

The trial court did not err in finding the plaintiffs had a right to the use of the ditch ■

On the 10th day of February, 1943, appellants obtained a quitclaim deed from respondents covering the entire tract of land owned by the appellants. The facts and circumstances pertaining to the execution and delivery of this deed as found by the court and reflected by ■ the record were these: After appellants, the Brockbanks, acquired the Columbia Village tract, a title insurance company discovered a discrepancy in the boundary line between appellants' and respondents' property. In

order to borrow money to finance the construction program it was necessary that title insurance be obtained, and this could not be accomplished until the title to the strip in dispute was cleared. Alan E. Brockbank then prepared a quitclaim deed and importuned the respondents to sign it. The respondents at first refused to sign the deed, but subsequently, after a number of visits by appellant, Alan E. Brockbank, and after he had repeatedly informed respondents the sole purpose of the deed was to clear up the discrepancy in the boundary, appellants executed the deed. No consideration was paid for the deed, and no discussion was had with respect to the respondents' releasing their rights to the use of the ditch. Appellant Brockbank never considered that respondents had quit-claimed their right to the use of the ditch until he discussed it with his attorney, and if Alan E. Brockbank intended to obtain more than a correction of an erroneous description, then he misrepresented his intentions to respondents.

That respondents did not understand that their rights to the use of the ditch were included in the deed, and that they relied on the statements of the appellant, Brockbank, to the effect that the deed was only for the purpose of clearing up the discrepancy, is the only logical conclusion this court can reach after reading the evidence contained in the record. The record further indicates, and the trial court so found, that Brockbank had knowledge of the existence of the easement and also that he knew that his representations to the Adamsons (as to the purpose and the effect of this quitclaim deed) were not true. Appellants contend that the evidence was insufficient to justify the trial court in setting aside the deed, but with this contention we cannot agree. In the opinion of this court, the evidence amply supports the findings of the trial court in this respect.

The testimony indicates there was no consideration for the deed. This is at variance with the stated consideration of $10; however, no United States revenue stamps appear on the deed, and this is consistent with no consideration. 16 Am. Jur. p. 456 sets forth the general rule with respect

to the effect of inadequacy or want of consideration. The text states:

"* * * However, if the inadequacy of consideration is so glaring as to stamp the transaction with fraud and to shock the common sense of honesty, a court of equity will intervene. If the consideration is grossly inadequate, equity in any case will lay hold of slight circumstances of oppression, fraud, or duress, in order to rescind the conveyance. Inadequacy of consideration tends to show fraud, where other circumstances point to misrepresentation, imposition, undue influence, oppression, abuse of a confidential relationship, etc. * * *"

Granted that a quitclaim deed given to correct a boundary discrepancy may recite a nominal consideration and yet be legally effective; however, when, as here, a party claims a valuable and additional right was released or quitclaimed, then the adequacy of the consideration becomes important. To insist that respondents conveyed away a right as valuable as the one herein involved, without consideration, shocks one's sense of justice, and the court should scrutinize all the facts to determine whether the conveyance was obtained by fraud, misrepresentation, or trickery. As previously indicated, we are not concerned with the rights of bona fide purchasers; we are only concerned with the rights between the parties to the transaction.

The trial court could have resolved this question against the appellants on one of two grounds: Firstly, if the court found that appellant, Brockbank, had no knowledge of the existence of the ditch and none of the parties to the deed had any intention of dealing with the rights to the ditch, then it would have been a case of mutual mistake as to the extent of the property conveyed. A court of equity can set aside a deed where there has been mutual mistake as to the interest of the grantor in the property conveyed, whether it be a mistake of fact or law. (See 26 C. J. S., Deed, § 55, page 272.) As said in 16 Am. Jur. 466:

"in other words, if a deed does not express the agreement of the parties to it, if there is such an agreement, it is immaterial whether a mistake therein made is one of law or fact."

The second ground and the one which influenced the trial court to set aside the deed was fraud and misrepresentation. Can this holding be sustained under the previous decisions of this court? *Nielsen* v. *Leamington Mines & Exploration Corp.*, 87 Utah 69, 48 P. 2d 439, is quoted by the appellants in support of their contention that the court erred. The decision at page 76 of 87 Utah, at page 442 of 48 P. 2d quotes the language of the Supreme Court of the United States in the case of *Southern Development Company* v. *Silva*, 125 U. S. 247, 8 S. Ct. 881, 31 L. Ed. 678:

"In order to establish a charge of this character the complainant must show by clear and decisive proof: First, that the defendant has made a representation in regard to a material fact; secondly, that such representation is false; thirdly, that such representation was not actually believed by the defendant, on reasonable grounds, to be true; fourthly, that it was made with intent that it should be acted on; fifthly, that it was acted on by complainant to his damage; and, sixthly, that in so acting on it the complainant was ignorant of its falsity, and reasonably believed it to be true. * * *"

Applying the foregoing principles to the facts of this case, appellant Brockbank made a representation of a material fact in that he represented that the purpose of the deed was solely to clear up the discrepancy in the boundaries. That such representation was false is amply supported by the acts and conduct of appellant Brockbank. He was in the real estate business, had handled many conveyances of property, was familiar with the legal effect of deeds, prepared the deed so it covered more property than was intended, denied he intended to include the rights to the use of the ditch, and yet later insisted that the deed had extinguished respondents' rights. The court found that during the time Brockbank was negotiating with respondents for this quitclaim deed he had knowledge of the existence of the eastment, and although he testified to the contrary, the court was fully justified in disbelieving his testimony. Many witnesses, including residents of Columbia Village, testified the ditch was clearly visible even after the houses were built and occupied. When

Brockbank made the statement to respondents that the only effect of the deed was to clear up the existing discrepancy in the boundary lines, he did not actually believe, upon reasonable grounds, that the representation was true. The representation was made with intention that it would be acted upon, and was acted upon by respondents to their detriment. Furthermore, respondents were obviously ignorant of its falsity, yet reasonably believed it to be true. These facts, under the rules of law previously announced by this court, clearly makes out a case of fraud and misrepresentation.

Black, in his text on Rescission of Contracts, paragraph 68, at page 172, lists four additional elements of "actionable fraud," only two being of any importance to this case:

(1) "The representation must relate to a past or present matter of fact, not a matter of law, must not be merely promissory, and must not be put forward simply as an expression of opinion; and (2) The circumstances must have been such as to justify the defrauded party in relying on the representation, as a basis of his own decision or action, without making an independent investigation of its truth or falsity, or he must have been in some way dissuaded or prevented from making a sufficient investigation * * *."

The case of *Ackerman* v. *Bramwell Investment Company, et al.*, 80 Utah 52, 12 P. 2d 623, 626, is cited by appellants as controlling in this case. That case holds as quoted by counsel

"the general rule is that misrepresentations of law or of the legal effect of contracts and writings does not consitute remedial fraud."

There is also, however, the following statement which must be given weight:

"There are exceptions to the rule, or rather circumstances or conditions rendering it inapplicable, but none of them are here present."

In the situation confronting us we have other circumstances and conditions. We need not go into these, as the

representation here was one of fact, i. e., that the purpose and effect of the deed was only to fix the boundary. If appellant, Alan Brockbank, was falsely intending to obtain more under the deed, then this was a misrepresentation as to his intentions. This is the case of a grantee inducing the grantor to execute a deed which, unbeknown to the grantor because of his ignorance of such matters, conveyed much more than the grantor intended it to convey. What rights the grantee, appellants in this case, intended to acquire under this deed is not a question of law but a question of fact.

In considering the last of the principles above quoted, it is sufficient to state that appellant Brockbank, by virtue of his superior knowledge; by his act of taking respondents to the courthouse and pointing out the plats which revealed the existing discrepancy; by assuring respondents he would satisfy their mortgagee that the quitclaim deed was only for the purpose of clearing up the discrepancy; by obtaining clearances from the mortgagee of respondents' property; and by having a representative of the title insurance company further assure them of the necessity and purpose of the deed; all these were such circumstances as justified respondents in relying on Brockbank's representations without making an independent investigation.

The last question to dispose of is: Did the court correctly assess the damages? In the judgment as entered the Court separates the monetary award of the judgment into two parts. The first part of the decree grants judgment against the appellants in the sum of $1,202.84. The ██ judgment and decree does not indicate on its face how this sum was determined. The second part of the judgment awards respondents the sum of $2,000 for damages suffered by reason of the destruction of the ditch, in the event the ditch is not reconstructed within 60 days. The findings of fact indicate the sum of $1,202.84 was allowed by the court on account of special damages suffered by respondents during the year 1943 and 1944. However, the findings do not separate the damages as to the specific items alleged in respondents' complaint. The findings of

fact also include an element of damages in the sum of $2,000, but again, no information is included as to how the court arrived at this amount.

The record has been searched, and it is impossible to find therein sufficient evidence to sustain the court's findings on both the general and special damages.

Treating the general damages first, the only evidence in the record consists of witnesses' stating their opinions as to the value of the land with water, and the value of the land without water. If this testimony determined the proper element of damage, there would be sufficient evidence to justify the finding. However, this is not a proper or correct method of determining this element. The true test is the difference in the value of the land with and without the easement, which in this case consisted of the ditch. The water or its value was not destroyed. Respondents still have their stock and the right to the use of the water. They have only been denied the conduit through which the water could pass. In some cases the same results might be obtained, and others it might not. By way of illustration, suppose in the present action a new ditch might be constructed for $1,500. The element of damage would not then be $2,000. It would only be the cost of replacing the ditch. Again, if the cost of bringing water to the land were in excess of the difference between the value of the land with and without the ditch, then the true element of damage would be the difference in value of the land with and without water less the value of the use of the water, or for practical purposes, the value of the water stock. The court undoubtedly realized this when it provided the ditch be replaced or, if this were not done, then that respondents have judgment for $2,000. The difficulty is, the record is barren of any evidence of the cost of replacing the ditch. The effect of the judgment as based on the evidence is to recompense respondents for destruction of the ditch plus the destruction of the right to the use of the water which they still own.

There is a memorandum in the file showing the manner in which the court arrived at the above stated sums of $2,000

and $1,202.84, but this memorandum is not properly before the court. It is not part of the judgment roll and was not incorporated in the bill of exceptions. Where the opinion of the trial court is settled in the bill of exceptions and is made part of the record, this court may look to it to ascertain the trial court's reasons for its decision, but such reasons do not amount to a judicial finding, and are without any judicial effect. *Headlund* v. *Daniels et al.,* 50 Utah 381, 167 P. 1170. The mere fact that a document is in the file does not permit this court to consider it as being before the court. Section 104-30-14, Utah Code Annotated, 1943, has prescribed what constitutes the judgment roll, and a trial judge's memorandum is not therein included. If litigants desire that items not listed in Section 104-30-14 be considered by this court, they must include them in the bill of exceptions.

This is an appeal wherein it is well to direct attention of counsel to the rules of this court. The special damages alleged by plaintiffs consist of nine items. These range from the cost of digging a well to damages for the loss of various crops. Appellants assign insufficiency of the evidence to justify the findings and both parties argue the question in their briefs. Yet in only three instances is any reference made to the places in the transcript of 637 pages where testimony concerning damages can be found, and those references only go to two items of the special damages. The balance of the facts, if any, are buried in the transcript, and their presence or absence has been left to this court to determine. Rule VIII of this court requires appellant to set forth a brief and concise statement of facts, giving reference to the pages of the record supporting the statement of such facts. If respondent agrees with the statement he shall so indicate. If he contradicts them, he shall state wherein the facts are contradicted, and make a statement and reference in his brief to the record where the statement of appellant is contradicted. This applies equally to all questions of fact, including those of damages, if counsel intend to raise the insufficiency of the evidence to sustain

the findings of the court. Litigants are entitled to have their rights determined with reasonable dispatch, and the rules adopted are for the purpose of expediting the decision on appeal. To ignore the rules or only partially comply with them defeats this purpose.

Plaintiffs in their complaint allege special damages in the amount of $2,245. The individual items are these: Alfalfa destroyed, $100; grain on three acres of land which plaintiffs were prevented from planting, $100; alfalfa crop for 1944 which plaintiffs were prevented from realizing, $100; grain on three additional acres of land which plaintiffs were prevented from planting, $120; ½ acre of cucumbers which plaintiffs were prevented from planting, $300; loss of 1¼ acre of potatoes, $500; cost of digging well, 400; garden crops and fruit destroyed, $125; punitive damages, $500.

Nowhere in the judgment or findings of fact or conclusions of law could we find any indication of what amount the court allowed for any of these items. This necessitated checking the record to determine whether or not there was sufficient evidence on enough of the items to justify the total award.

The item of $500 for punitive damages can be eliminated without further discussion, because there is no finding by the court that appellants or any one of them acted in a malicious or wilful manner. As to the balance of the items, it would unduly lengthen the opinion to set out the evidence in the record, or lack of it, in regard to the costs and expenses of producing the crops, their market value at maturity, and other elements necessary to establish the true measure of damages. Suffice it to say there is sufficient evidence to establish the damages for loss of alfalfa for the years 1943 and 1944. These, however, could not exceed the amount of $200 set up in the complaint. The record is entirely barren of any evidence touching on damages for loss of cucumbers, so this item must be eliminated. Any award for potatoes must likewise fail. While the record indicates that a previous tenant raised 700 bushels

to the acre, and that respondents had planted potatoes during the spring of 1943, there is no evidence as to the cost of planting and raising, nor is there any evidence as to the market value for any year. Another cogent reason why damages for loss of potatoes cannot be awarded can be gleaned from a statement by respondent, Thomas W. Adamson, to the effect that he marketed a few bushels of the potatoes. Just how many bushels he sold or how much he received for them remains unanswered. The only evidence in the record in regard to garden crops, berries and fruit destroyed is that respondents purchased 1,250 strawberry plants at $12.50 per thousand, and 1,000 raspberry bushes at an undisclosed price. The former he lost, and of the latter he saved about half.

There is considerable evidence in the record regarding the quality of the land for raising sugar beets. Also as to the cost of planting and harvesting, the market values for the year 1943, and the yield per acre. This cannot assist respondents, for the reasons that no allegations are made in the complaint that respondents suffered any damages for the loss of beets, and obviously if damages were awarded for destruction of one crop for a given acreage, damages for destruction of another crop for the same acreage could not be awarded.

Respondents testified that they had prepared some eight and one-half acres of land to be seeded with wheat; however, it was not planted because of the lack of water. It therefore appears that if the court awarded damages for loss of grain, that respondents were awarded damages for profits on future crops. This is not a proper element of damage if the destruction of an easement is permanent and damages are awarded for the destruction. In 28 C. J. S., Easements, § 114, page 822, what we deem to be the correct rule is stated by the author in these words:

"* * * If the obstruction is permanent the measure of damages is the difference in the market value of the owner's property with the passway open and with it closed, or, as otherwise stated, the difference between the reasonable market value of the land immediately before

it was known that the way would be obstructed and its market value immediately after it was destroyed. * * *"

Whether or not the court included the $400 for the well is also not properly before us. Regardless of whether it did or not, the record is unsatisfactory on the amount of damage. Respondent stated it cost him $400 to sink the well. However, the record fairly indicates that ■ respondents had no culinary water, and were unable to get the City of American Fork to furnish it. The question of whether or not the ditch water was potable is not answered satisfactorily by the record. Respondent in answer to a question testified that such water could be used for drinking and cooking purposes if it had to be. He further testified that even though the water came in turns and was not available daily, it might be possible to collect and use it for culinary purposes if he constructed a cistern. If the well was drilled for culinary purposes and was necessary for this reason, regardless of the destruction of the ditch, then it was not a proper element of damage. In addition, if the court awarded respondents full damage for permanent destruction of the easement, and the right to the use of culinary water was included in the easement, it is difficult to determine how respondents would then be entitled to an additional award for the cost of digging the well. This is in effect permitting respondents to recover for both permanent destruction and for partial replacement.

There is mention made in appellants' brief of an award for rent and in respondents' brief of the fact that the rental value of the property was of sufficient amount to justify the court in its award. One answer to this is, assuming rental value to be a proper element of damage, ■ respondents failed to allege or claim this in their complaint. Again, it is impossible to determine from the record before us whether or not this was considered by the trial court in arriving at the sum total of special damages. While the memorandum so indicates, as previously suggested, this is not properly before us.

In view of the fact that this case is being remanded for a redetermination of the amount of damages, it is considered advisable to set forth our opinion on the proper elements of damage, as presently pleaded.

For general damages, the difference in the value of the land with and without the ditch. For special damages, the actual expenditures by respondents for the purchase of seed for the year 1943, the expenses incurred in preparing the land for cultivation; the loss of crops already planted or already in existence for the year 1943, if not included in the value of the land before destruction of the easement; the cost of digging the well if the water running through the ditch were usable for culinary purposes, and this was not taken into account in the destruction of the easement; and interest on the amount awarded as damages, at the legal rate from the date of the destruction of the easement.

The damages as set out above are based on the assumption that the destruction of the ditch is permanent. However Mr. Justice Wolfe in his concurring opinion rightly calls attention to the fact that no opinion is expressed on the elements of damages in the event the trial court permits the reconstruction of the ditch. If the trial judge orders and the appellants reconstruct a satisfactory substitute, then respondents would not be entitled to recover the $2,000 for depreciation in the value of the land. In lieu of this element, the respondents would be entitled to recover the difference between the reasonable rental value of the property (effected by the destruction of the ditch) with water, and the reasonable rental value of the property without water from the date of the destruction to the date of the replacement. The other elements of damage to remain the same except interest. If the respondents are awarded damages for crops destroyed in 1943, then so much of the land as was used for growing these crops should not be included for reasonable rental purposes for that year.

The judgment is set aside and remanded with instructions to determine the damages suffered by respondents, in accordance with the view expressed herein. Plaintiff to be

permitted to amend the pleadings with regard to damages, if so desired. Each party to bear his own costs.

McDONOUGH, C. J., and WADE, J., concur.

PRATT, Justice (concurring in part and dissenting in part).

I concur with the principles discussed upon the merits, but invite attention to this dissent as to the motion to dismiss.

A motion for dismissal of this appeal has been interposed upon which the following issue is raised:

Is an appeal within time which is taken within 90 days from the date of entry of a nunc pro tunc order amending the judgment, *but after* 90 days from the date of the overruling of the motion for a new trial?

The factual background for this discussion is as follows:

*Among the defendants* in this action *is the Federal Homes Inc.* Of that defendant the findings of fact, conclusions of law, judgment and decree have this to say:

From the findings of fact:

"11. That on or about the 24th day of February, 1943, said Alan E. Brockbank and Gaylie Rich Brockbank conveyed to the *Federal Homes Inc.*, the said lands over which said irrigation ditch and right-of-way passes, and that at the time of said conveyances said Alan E. Brockbank was an officer of the said *Federal Homes Inc.*, to-wit, its President, and during all of the times hereinbefore mentioned he was such officer of the said *Federal Homes Inc.*, and continued to be such officer until the time of the trial hereof."

"12. The court further finds that at various dates between the 24th day of February, 1943 and the 26th day of March, 1943, said defendants, Alan E. Brockbank and Gaylie Rich Brockbank and the *Federal Homes Inc.*, a corporation, and their agents and servants, entered upon the said irrigation ditch and right-of-way against the will and without the consent of the plaintiffs and filled up and destroyed said irrigation ditch and thereby prevented the plaintiffs from the use thereof and from obtaining water owned by them through the said irrigation ditch and thereby made it impossible for the said plaintiffs to irrigate the crops growing upon the said lands and thereby causing the destruction and loss of said crops for want of water, and on account of said ditch being filled up and destroyed plaintiffs were prevented from planting, growing and

maturing other crops during the crop seasons of 1943 and 1944 and were put to great damage and expense in providing water for culinary and domestic purposes."

\* \* \* \* \*

"18. The court further finds that the plaintiffs by reason of the actions of the defendants, Alan E. Brockbank and Gaylie Rich Brockbank and *Federal Homes Inc.*, a corporation, and of their servants and agents, in filling up and destroying the said irrigation ditch of the plaintiffs and preventing them from conveying water to their lands herein described for the necessary irrigation of their crops and on account of depriving them from the use of said property in the raising of crops during the years of 1943 and 1944 said plaintiffs suffered damages in the sum of $1202.84."

(Finding No. 19 refers to additional damage.)

\* \* \* \* \*

"22. The court further finds that at the time of the purchase by the *other individual defendants* of their respective homes from the *Federal Homes, Inc.*, said individual defendants purchased said homes for a valuable consideration and without any notice or knowledge of any claim or interest of the plaintiffs to any right-of-way or irrigation ditch over the property thus purchased."

From the conclusions of law:

"1. That the plaintiffs, Thomas W. Adamson and Mina Adamson, are *entitled to the judgment* of this court awarding to them damages *against* the defendants, Alan E. Brockbank, Gaylie Rich Brockbank and the *Federal Homes Inc.*, a corporation, in the sum of $1202.84, together with interest thereon from January 1, 1945, at the rate of six percent per annum until the date of judgment.

"2. That said plaintiffs are further *entitled to a judgment against* the said defendants, Alan E. Brockbank, Gaylie Rich Brockbank and *Federal Homes, Inc.*, a corporation, for the sum of $2,000.00 as damages to the land of the plaintiffs described in plaintiff's complaint by reason of the destruction of plaintiff's ditch and the deprivation of their right-of-way described in plaintiff's complaint, together with interest thereon at the rate of six percent per annum from January 1, 1945 to the date of judgment herein; provided, that if said Alan E. Brockbank, Gaylie Rich Brockbank and *Federal Homes, Inc.*, a corporation, shall within 90 days from the entry of judgment herein repair and reconstruct said ditch and shall cause to be restored to said plaintiffs said right-of-way for said ditch so that said plaintiffs can convey ther water through said ditch and over the said right-of-way for the irrigation of said lands owned by

the plaintiffs and described in plaintiffs' complaint, then the said defendants, Alan E. Brockbank, Gaylie Rich Brockbank and *Federal Homes, Inc.*, shall be entitled to be credited upon the amount of said judgment the sum of $2,000.00.

\* \* \* \* \*

"4. That the defendants *other than* Alan E. Brockbank, Gaylie Rich Brockbank and *Federal Homes, Inc.*, a corporation, are entitled to the judgment of this court *dismissing* the plaintiff's complaint as to them."

## From judgment and decree:

"1. That the plaintiffs, Thomas W. Adamson and Mina Adamson, do have and *recover judgment against* the defendants, Alan E. Brockbank, Gaylie Rich Brockbank and *Federal Homes, Inc.*, a corporation, for the sum of $1202.84, together with interest thereon from January 1, 1945, until the date of this judgment, amounting to $1289.01."

"2. That the said plaintiffs, Thomas W. Adamson and Mina Adamson, are further *entitled to judgment against* the said defendants, Alan E. Brockbank, Gaylie Rich Brockbank and *Federal Homes, Inc.*, a corporation, for the sum of $2,000.00 as damages suffered by the plaintiffs by reason of the destruction of plaintiff's ditch and by reason of being deprived of said ditch and right-of-way described in plaintiff's complaint, together with interest on said sum at the rate of six percent per annum from January 1, 1945 until the date of this judgment, amounting to $2148.50."

"It is provided, however, in this connection that if the said defendants Alan E. Brockbank, Gaylie Rich Brockbank and *Federal Homes, Inc.*, a corporation, shall within 90 days from the entry hereof repair and reconstruct the said ditch and shall cause to be restored to said plaintiffs said right-of-way for said ditch to the said plaintiffs so that plaintiffs can convey their water through said ditch and over said right-of-way, then there shall be credited upon said judgment the sum of $2,000.00."

\* \* \* \* \*

"4. It is further ordered, adjudged and decreed that the plaintiffs do have and *recover their costs* herein expended *against* the defendants, Alan E. Brockbank, Gaylie Rich Brockbank and *Federal Homes, Inc.*, a corporation."

"5. It is further ordered, adjudged and decreed that the plaintiff's *complaint as to* the First Security Trust Company, a corporation, *Federal Homes, Inc.*, a corporation; Bud Pate and Mrs. Bud Pate, impleaded herein as Bud Tate and Mrs. Bud Tate; F. H. Durfee and Mrs. F. H. Durfee; Ralph Garrett and Mrs. Ralph Garrett; Earl

Schow and Edith P. Schow, impleaded herein as Mrs. Earl Schow; Melvin Williams and Theressa J. Williams, impleaded herein as Mrs. Melvin Williams; Lee Kirby and Zelba Kirby, impleaded herein as Lee Kerby and Mrs. Lee Kerby; Ray Curran and Gertrude Curran, impleaded herein as Mrs. Ray Curran; John L. Cyphers and Mary Cypers, impleaded herein as Jack Cyphers and Mrs. Jack Cyphers; Max Nielson and Leah B. Nielson, impleaded herein as Mrs. Max Nielson; Amber Boulter and Ruth M. Boulter, impleaded herein as Mrs. Amber Boulter, be and the same *is hereby dismissed.*" (All italics in the above quoted matter are mine.)

Obviously the inclusion of *Federal Homes, Inc.*, in Par. 5 of the judgment and decree was a clerical error. That paragraph was intended to correspond with Par. No. 4 of the conclusions of law, and when an analysis of the other quotations is made, it shows clearly why such was the case.

The Federal Homes, Inc., was one of the defendants who moved for a new trial. If it thought the action had been dismissed as against it, such a motion was indeed a strange way of evidencing such a thought. The motion for new trial was denied May 17, 1946. On June 12, and 14, 1946, the plaintiffs (Adamsons) served and filed a notice of motion to strike from paragraph 5 of the decree the words *"Federal Homes, Inc., a corporation"* on the grounds of inadvertence and mistake and that it was a clerical error. On the 23d day of June, 1946, an "Order Amending Judgment" was entered correcting the error and directing

"that this order correcting the said judgment and decree and the record thereof be entered nunc pro tunc to appear on the record as of the 29th day of March, 1946, that being the time date when said judgment and decree was originally made and entered."

This order recites that it appears that this mistake was

"by reason of inadvertence and clerical error."

The appeal is from the judgment and decree as entered on the 29th of March, 1946,—quoting in particular certain paragraphs—and also an appeal is taken from

"the order and judgment made and entered in the above entitled court and cause on the 23rd day of June 1946."

It seems rather obvious that the parties and the lower court have considered this error as merely clerical up and until the motion for dismissal—the defendants by their motion for new trial, the plaintiffs by their motion to strike, and the lower court by the finding supporting the motion to strike.

If just a clerical error, then its correction would not extend the time of appeal; if a substantial error, it would be reasonable to hold that a motion to correct it would have the same effect as a motion for a new trial—extend the time to appeal until it was ruled upon.

It seems obvious that the error is clerical. This shows upon the face of the record. No one has been misled as to that fact.

Attention is invited to the following authorities: *Cullen v. Harris et al.*, 27 Utah 4, 73 P. 1048; *Cody v. Cody*, 47 Utah 456, 154 P. 952; *Citizens' Nat. Trust & Savings Bank of Los Angeles v. Holten*, 210 Cal. 44, 290 P. 447, Sec. XV, 10 A. L. R. 588, 67 A. L. R. 842, and 126 A. L. R. 977; Amer. Juris., Vol. 30, Sec. 111, p. 877.

The appeal should be dismissed.

WOLFE, Justice (concurring).

I concur in the order denying the motion to dismiss on the ground that the amendment to the judgment changed the substance or character of the judgment. I am not prepared to say that the time for appeal would not have run from the date of the overruling of the motion for a new trial, had not the motion to amend the judgment been timely made and especially when made within 90 days of the date of the overruling of motion for a new trial.

As stated by Mr. Justice Pratt in his dissent, it should have been obvious to the appellants that the clerical error introducing a substantial inconsistency in the judgment was an inadvertence. I am not prepared to say that they could have used it as a means of indefinitely postponing the running of the time to appeal. But in this case they knew that

there was a motion to eliminate the mistaken inclusion of Federal Homes, Inc., among the list of defendants in regard to which the complaint had been dismissed and that the motion was granted. I think they may have reasonably relied on a conclusion that the alteration was one which changed the character of the judgment and that we would so find. It certainly did that on the face thereof, even though the defendants must have appreciated the fact that inclusion of Federal Homes, Inc., among the list of those in regard to whom the complaint was dismissed was an obvious mistake. I prefer to lean in favor of rulings which preserve the right of appeal rather than those that take it away, when there is doubt.

In that part of the prevailing opinion which treats the application of the factors to be taken into consideration set out in Sec. 476, page 2977 of the Restatement of the Law of Property, in determining whether an easement should be implied, I point out that it is not necessarily meant that in each case each factor from (a) to (h) both inclusive will play a part. Consideration of some of the factors may result in a conclusion that they are not helpful in a particular case. The list is given in an attempt to present a fairly complete roster of factors which may in various cases come into play. The opinion itself recognizes that, for in the instant case it omits mention of factors (b), (d), and (f), which I agree have no applicability to this case.

The majority opinion states that the trial court could have rescinded the quitclaim deed on either the ground of mistake or fraud. As an abstract proposition this may be correct, but I think it unnecessary to consider the ground of mistake. In this case the court found that Brockbank realized that Adamson was not aware that the quitclaim deed would in legal effect relinquish all his right to the easement, but that he (Adamson) only intended it to have a limited effect; that Brockbank must have known that Adamson did not know that it would have that effect. Since the deed was given for Brockbank's benefit for a limited purpose and without consideration to Adamson, there was placed upon

Brockbank a duty not to take advantage of his realization of the impression under which Adamson was laboring. Brockbank was placed by these circumstances in a relationship to Adamson which invested him (Brockbank) with a duty to disclose the full import of a quitclaim deed. I see no objection to the theory of the main opinion that an announcement by Brockbank that his sole intention was to straighten out boundaries was a statement of a fact—his state of mind—which he intended Adamson to act upon, and that Adamson in relying on that fact did act upon it, and so if Brockbank had any further intention, he fraudulently misrepresented the fact of his state of mind. I assume that the result would be the same in this case had there been a consideration of $10 for the quitclaim deed.

This case is to be remanded for further proceedings as to the matter of damages. As to the elements of damage the opinion advances certain advice and guides to the lower court in order that they may be fixed in view of several possible contingencies which may be contained in that judgment. I agree with that part of the opinion, but I add the following by way of supplementation to which the main opinion makes allusion.

When a farmer purchases land he can either farm it or rent it to tenants. In either case he will receive a return on his investment. When for a substantial period of time he is precluded from using his land, he thereby fails to receive a return on his investment. He is entitled to compensation for this loss. On the other hand, some wrong-doers might permanently destroy a part of his land, which would immediately entitle him to compensation for the resulting loss in value. (In this case the $2,000 mentioned in the prevailing opinion.) He would thereby receive back a part of his capital investment. The court does not award him compensation for annual loss of income in the future because he can reinvest the compensation for the permanent injury to his land, and this new investment will afford him earnings in the future in place of those he lost by the destruction of his land. And by giving him legal interest on the damages

from the date of deprivation he will be compensated as if he had had the money invested. But in this case if the easement is restored the plaintiffs should be reimbursed for the loss occasioned by this enforced idleness in place of the element of permanent loss.

The following distinction should be pointed out: Where an easement is quite obviously permanently destroyed at the outset, as would be the case where a substantial building is erected across the way, the easement owner would be obligated to mitigate his damages by promptly realizing whatever he could on his property, as by selling it or putting it to a new use. He could not leave it idle to pile up damages. In the case before us, however, plaintiff apparently did not know that the obstruction would not be removed, and could not be expected to sell his land, though if he could have rented it at a reduced rate, he should have done so.

What is the measure of damages for the loss resulting from the enforced idleness of the land? Since its purpose is to provide an appropriate annual return on the value of the landowner's investment, it would seem this could best be done by allowing legal interest on the value of the land with water for the period during which plaintiffs were denied the use thereof less the profits, if any, made on the land without water during that period. However, the cases indicate that the injured party is allowed the fair rental value, rather than interest, for the period during which the use of the land was denied. So, in *Gila Water Co.* v. *Gila Land & Cattle Co.*, 28 Ariz. 531, 238 P. 336, 337, where defendants wrongfully diverted water from the plaintiffs' land, the court said:

"* * * where land is prepared for growing crops but the same is not planted and cultivated by reason of the wrongful act of another, the measure of damages in such case is the reasonable rental value of the land during the time the land was prevented from being cropped by reason of such wrongful act."

To like effect or *Dilday* v. *David, et al.*, 1939, 178 Ark. 898, 12 S. W. 2d 899; and *Ft. Worth & D. C. Ry. Co.* v. *Speer*, Tex. Civ. App., 1919, 212 S. W. 762.

If the further taking of testimony reveals that the land had any rental value during the period the easement was obstructed, that should be deducted from the fair rental value of the land with water.