## OBERG v. SANDERS et al.

No. 7022.  Decided September 8, 1947.  (184 P. 2d 229.)

See 37 C. J. S. Fraud, Sec. 11. Opportunity of buyer of personal property to ascertain facts as affecting claim of fraud on part of seller in misrepresenting property, see note 61 A. L. R. 492. See, also, 23 Am. Jur. 947.

*Grant Macfarlane, R. S. Richards* and *Pugsley, Hayes & Rampton,* all of Salt Lake City, for appellant.

*Thatcher & Young,* of Ogden, and *Elias J. Pickett,* of St. George, for respondents.

McDONOUGH, Chief Justice.

Plaintiff sued to recover damages for alleged fraud and deceit in the sale by defendants to plaintiff of 11,000 day-old turkey poults. From a judgment of non-suit, plaintiff appeals.

By his complaint, plaintiff in substance alleged: That defendants Parsons and Meikle acted as agents for defendants Sanders Brothers; that the latter operate a hatchery in Southern Utah; that on April 13, 1945, defendants induced plaintiff to purchase 11,000 day-old turkey poults at a price of 80 cents each, upon the following representations: That said poults from the Sanders hatchery in southern Utah were "A-1 birds, free from disease of every kind, in good health and equal in quality to any poults on the market;" that the mortality rate would be less than among poults brought in from outside of Utah for the reason delivery could be made more rapidly from the hatchery to plaintiff's brooder-houses. Plaintiff alleged that defendants knew or had reason to believe that said poults sold to plaintiff "at the time of sale and delivery" were infected with a contagious disease; and that defendants knew their representations were false and made with intent to induce plaintiff to make an agreement to purchase; that plaintiff relied on said representations and was induced to purchase

said poults without having seen them; that deliveries were made on May 20, 25 and 28, 1945, totaling 10,191 poults; that plaintiff paid the purchase price therefor; that at the time of delivery of said poults they were infected with a contagious disease, in consequence of which great numbers of them died; that plaintiff provided proper feed, medication and care, and consulted experts in the treatment of turkey diseases; nevertheless 7650 died; and that by reason of the purchase price of poults which died, the expenditures for feed, labor and medicines therefor, plaintiff was damaged in the sum of $14,845.45, and by reason of loss of profits plaintiff was further damaged in the sum of $17,-336.

There is no allegation that the death loss occurred from any cause other than from a contagious disease with which the poults were allegedly infected at the time of delivery to plaintiff.

The question for determination in this case is whether the trial court erred in granting the motion for nonsuit. To decide this question we must view the evidence in the light most favorable to plaintiff. If plaintiff established by sufficient competent evidence each of the essential elements of his alleged cause of action to make out a prima facie case of liability, the court erred in nonsuiting the plaintiff. If not, the judgment should be affirmed. We have examined the evidence, which is summarized as follows:

One witness testified that defendant Parsons came to plaintiff's home and asked plaintiff to place an order for poults from the Sanders hatchery; that plaintiff's assistant manager objected to the proposed purchase, stating that "they had not been proved;" whereupon Parsons told plaintiff that poults from the Sanders hatchery were as good in health and quality as anything on the coast or in Oregon; that said poults were produced in practically the same climate where they would be raised, and would be able to take the weather conditions better than poults from a different climate; and that such poults could be delivered

sooner than poults from outside the state and that the mortality rate would therefore be less. Another witness testified that Parsons said that poults from the Sanders hatchery were "free from disease and sickness" of every kind.

Plaintiff attempted to prove that the Sanders poults were not only shown to be infected with disease upon examinations made some days after delivery, but that the poults were inferior in quality, and when delivered showed some lack of vitality and lack of uniformity in size. One witness testified that disease may even include "low vitality," although plaintiff stated that he relied on the representation that the poults were free from disease and sickness as the statement which he claims were made falsely.

The evidence showed that on June 8, 1945, after some death losses, plaintiff sent some specimens to the Provo laboratory of the State Agricultural College for examination and analysis, the report of which examinations showed a paratyphoid infection. There was some evidence that paratyphoid may be transmitted from the mother hen through the egg to the poult. Some of the tests made, particularly the test made on June 1, showed that the poults were deficient in vitamins. There was some evidence that lack of vitality might be due to deficiency in vitamins; that if the mother hen does not obtain the proper vitamins in her feed, the yolk will be deficient and fail to furnish the young poult the proper nutrients during the first several days after it is hatched; that in consequence of such deficiency it will lack vitality and be more susceptible to contagious disease. On cross-examination it was disclosed that normally the yolk is absorbed by the poult in 4 or 5 days, although in some cases it may remain unabsorbed for 2 weeks.

There was no evidence that the breeding stock at the Sanders hatchery failed to receive the necessary feeds which supply the proper vitamins in the egg yolk. There was no evidence that there was any paratyphoid infection at the Sanders hatchery. There was some evidence that in a separate pen at the premises of the defendants Sanders

there was a small flock of turkeys which appeared to have infectious sinusitis. There was some testimony that when it was first discovered that the poults which had been at plaintiff's brooder-houses for some days were deficient in vitamins, the laboratory which had made tests for plaintiff issued a written warning to be on guard for infectious sinusitis.

When the death loss began to reach alarming figures, plaintiff called on other turkey growers, including defendant Parsons, the plaintiff consulted laboratory technicians, including qualified veterinarians. However, plaintiff did not have the active service of any veterinary on the premises. He used sulfa drugs in the feed on the advice of one doctor. In fact, he used several sulfa drugs, none of which appeared to lessen the death rate. One witness who qualified as an expert, stated that if the poults were suffering from some vitamin deficiency, such drugs would be ineffective. The evidence does not show precisely what plaintiff did to attempt to overcome the vitamin deficiency, but such deficiency apparently rendered the flock vulnerable to infectious sinusitis. Numerous treatments were given for such disease which did not manifest itself until some weeks after the poults were shipped to plaintiff. There was some testimony that the weather was unusually wet, cold and windy in May, 1945.

To attempt to show the falsity of the statement that Sanders poults were equal or superior to poults produced on the coast or in Oregon as far as health is concerned, plaintiff offered evidence that at the time of trial Oregon poults were rated as pullorum free, which is the ultimate objective in all states which have adopted the standards set up by the National Turkey Improvement Plan. There was no evidence as to the rating on Oregon poults even as to pullorum tests at the date when defendants allegedly made their representations as to health of the Sanders poults. It was admitted that the Sanders hatchery operated under the National Turkey Improvement Plan, and met the standards as far as pullorum tests are concerned, and that in 1945 the

plan required that a flock of breeding stock should not have more than 2% of "reacters" to the pullorum test. At that time Sanders breeding stock was not rated "pullorum free," although it met the required standards as to the minimum reacters.

The first tests obtained by plaintiff on the Sanders poults which were delivered in May, 1945, were made on June 1, 1945, and they did not show any paratyphoid infection. The lack of such finding might have been due to improper specimens. However, the first tests which showed the presence of a paratyphoid infection among these Sanders poults were made on June 8, 1945. It was disclosed on cross-examination that plaintiff had paratyphoid infection on the premises as early as April 28, 1945. Prior to the time plaintiff placed an order for the Sanders poults which were delivered in May, plaintiff had ordered 5,500 poults from the Potts hatchery in Oregon. These poults arrived on April 18. On the day of arrival of the poults from Oregon plaintiff obtained a "fill-in" order of 300 Sanders poults to brood with the Oregon poults. That was 5 days after the alleged misrepresentations were made by defendants whereby the 11,000 poult order was obtained.

Plaintiff began to have considerable losses among the Oregon poults in April, and 400 out of the 5500 died within 10 days. On April 28 he took specimens to the Provo laboratory. The tests showed that these poults were then infected with paratyphoid. One witness testified that plaintiff gave him at the laboratory the history and symptoms of the disease, that the poults died rather suddenly, 56 having died 2 days prior to presentation of the specimens, and that death losses began to become heavy about the sixth day after the poults arrived. In connection with such tests, the laboratory sent plaintiff a letter recommending certain precautionary and sanitation measures with respect to feeders, water and litter. Plaintiff testified that the poults from the Sanders hatchery which constituted the "fill-in" order were mingled with the poults from the Oregon hatchery, and that the entire flock became infected with para-

typhoid. The laboratory report, based on the case history furnished by plaintiff, identified the specimens as having been hatched at the Potts hatchery in Oregon.

About May 12 the Oregon poults, which on April 28th had been found to be infected with paratyphoid, were removed from the one wing of the brooder-house where they had been brooded, to make room for the Sanders poults which began to arrive on May 20. Plaintiff's witnesses testified that certain sanitary and disinfecting measures were employed in cleaning the brooder-house to make preparation for arrival of the Sanders poults. The first portion of the 11,000 order of Sanders poults arrived in an air-conditioned truck on May 20, 1945. The balance arrived on May 25 and 28, 1945. No complaint was made as to their appearance, nor as to the apparent lack of vitality of any of the poults at the time of delivery, although at the trial plaintiff testified that they did not look uniform in size nor up to par, and that they showed lack of vitality from the moment of their arrival. Losses began to occur at an alarming rate, and on June 1 plaintiff had specimens taken to the laboratory as hereinabove related. The first tests showed no infection, but a deficiency in vitamins. Recommendations were made as to feed. Plaintiff was counseled to be on guard for infectious sinusitus in view of the vitamin deficiency. Some days later sinusitis did develop in this flock.

While there was evidence that pullorum and paratyphoid can be and frequently are transmitted from the mother hen through the egg to the poult, there was no evidence that anyone had produced any experimental proof that sinusitis is so transmitted.

Does the evidence constitue a prima facie case of damage by fraudulent representations or deceit? In testing the sufficiency of the evidence on motion for nonsuit, the evidence must be viewed as a whole, including the status of the evidence after cross-examination.

Plaintiff, as well as defendants, appears to rely on the authority of *Stuck* v. *Delta Land & Water Co.*, 63 Utah 495, 227 P. 791, 795, which sets forth the 9 basic elements of actual fraud:

"* * * '(1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance upon its truth; (8) his right to rely thereon; (9) his consequent and proximate injury'."

See also *Nielson* v. *Leamington Mines & Expl. Corporation*, 87 Utah 69, 48 P. 2d 439.

Obviously, a party cannot claim to have been defrauded in reliance on representations on which he had no right to rely. *Johnson* v. *Allen*, 108 Utah 148, 158 P. 2d 134, 159 A. L. R. 256. Furthermore, an alleged representation must be regarded in the light of the conversation, and may not be lifted out of its context nor considered apart from the circumstances or situation under which it was made. Nor can an alleged representation be given a meaning which cannot reasonably be attributed to it. See 37 C. J. S., Fraud, § 14, p. 242.

Defendants contend that plaintiff failed to prove that any of the defendants made any false representation of a material and existing fact, and that plaintiff merely proved that one of the defendants used a sales argument to express his opinion as to value. Generally, representations as to value are expressions of opinion, or "trader's talk." *Baird* v. *Eflow Inv. Co.*, 76 Utah 232, 289 P. 112. Defendants also argue that plaintiff could not have relied on any statement to the effect that the poults would be free from disease, for the reason they could not have been hatched for over a month after the alleged representations were made, and that the eggs were not even in the hatchery on April 13, 1945, when the alleged representations were made. Respondents say that inasmuch as no one can accurately predict how many eggs will hatch nor the condition of the poults when hatched, if such a representation were made it would not have been one on which plaintiff would have had any right to rely since he knew that any such prediction would be guesswork.

In analyzing the evidence as to the alleged representations, appellant contends that a party may be guilty of fraud by a promissory representation. *Hull* v. *Flinders*, 83 Utah 158, 27 P. 2d 56, holds that where a person makes a promissory representation as to a security (intangible property), which he knows he is unable to perform or which he has no intention of performing, he may thereby be guilty of fraud. In this case there is no claim made that the defendants made any promissory representations which they knew they were unable to perform or which they had no intention of performing.

From the evidence as to representations allegedly made, it would appear that Parsons was talking about the quality and health of poults then currently being produced at the Sanders hatchery. In other words he was discussing existing facts, as shown by the statement of plaintiff's assistant manager at the time, that he objected to the proposed purchase on the ground that "they had not been proved." It was in response to such remark that Parsons allegedly stated that the Sanders poults were as good in health and quality as anything on the coast or in Oregon; that said poults were produced in practically the same climate where they would be raised, and would be able to take the weather conditions better than poults from a different climate; and that such poults could be delivered sooner than poults from outside the state and that the mortality rate would therefore be less.

Obviously, the statements with respect to mortality rate being less because of earlier delivery, and that they would be able to take the weather conditions better than poults from outside the state, constituted a sales argument. The statement that the Sanders poults were as good in health and quality as anything on the coast or in Oregon, in the light of the context, must be construed to constitute an opinion as to poults then currently produced. While expressions of opinion amounting to mere sales arguments are not actionable, when one makes a representation as to quality of property sold, he must speak the truth,

and if he gives a dishonest opinion, he may be liable if the other elements of fraud are present. He must not practice deceit on the person he seeks to influence. See 37 C. J. S., Fraud, § 53, pp. 315, 316.

Appellant did not show that defendants gave a dishonest opinion, nor prove any damage from any alleged misrepresentation as to quality generally. There was no proof that even if plaintiff were warranted in using quality in the sense of vitality, freedom from disease and general quality affecting marketability, that the Sanders poults were not on par with poults produced on the coast or in Oregon.

Respondents say that if Parsons actually said that poults from the Sanders hatchery were "free from disease and sickness of every kind," such statement would not be actionable nor constitute any representation on which any person could rely. They point out that every person in the turkey business, as shown by the evidence, knows that poults are delicate creatures in the sense that they are susceptible to various diseases and require expert care, particularly during the first 8 weeks after leaving the incubator. Such statement should not be construed in this case to amount to a mere prediction, but should be interpreted to mean that when the poults were delivered they were not infected with some contagious disease. The trial proceeded on the theory that the representations were made with respect to health and freedom from disease at the time of delivery, so we need not concern ourselves with the known possibility that some future date after delivery the poults might contract some contagious disease.

Plaintiff alleged in his complaint that defendants knew at the time of delivery of the poults that they were afflicted with a contagious disease. It may be that such statement is tantamount to saying that defendants delivered poults not of the grade and quality which had been sold, and knew that poults of the grade and quality represented could not be delivered. However, plaintiff alleged that he suffered damage in consequence of death losses from a contagious disease which was present in the poults

when they were delivered. He did not predicate his case on any theory that defendants knew they were susceptible to disease, but that they were known to be infected. There is no dispute about the fact that the death loss was unusually high, since more than 75% of the poults died; but that fact does not warrant a conclusion that they were infected with a contagious disease at the time they were delivered to plaintiff.

We think there was a failure of proof, consisting of lack of sufficient competent evidence that the poults were infected with a contagious disease at the time of their delivery and that the defendants knew they were so infected. Plaintiff grounded his action on fraud, not on breach of contract. He did not sue for delivery of an inferior grade of poults, since he admits that he made no objection to the apparent lack of vitality and lack of uniformity in size. He proceeded on the theory that he purchased in reliance on the representation that the poults were free from contagious disease, and that such poults were diseased and defendants knew such poults were infected with a contagious disease, although one witness tried to explain that "disease" might even mean low vitality.

The rule is that the testimony of a witness is no stronger than where it is left on cross-examination. Plaintiff proved that on June 8, 1945, a paratyphoid infection was found among the Sanders poults which had been delivered in May. Such proof did not show that such infection or any other infection was present in the poults at the time they were delivered. The tests made a week earlier showed a lack of vitamins. Testimony produced on cross-examination revealed that on April 28 the very same kind of infection was found on the very same premises of plaintiff among poults obtained from Oregon. While plaintiff introduced some evidence that the premises were cleaned and that sprays and disinfectants were used in the brooder-houses where the infection had been found on April 28, there was no proof which would show that the premises were free from such contagious disease at the time the Sanders poults arrived in May.

Plaintiff produced evidence that paratyphoid may be transmitted from the mother hen through the yolk to the poult. He did not produce evidence that the breeding stock at the Sanders hatchery had any paratyphoid infection. The first tests of the Sanders poults were made on June 1, which showed no disease but a vitamin deficiency. Paratyphoid infection did not appear in tests until June 8. It was admitted that drugs would not overcome the vitamin deficiency, and that the proper nutrients would have to be added to feed. Plaintiff attempted to show that vitamin deficiency was associated with low vitality and that it could originate with improper feeding of the mother hens, but there was no proof that the breeding stock lacked feed containing the proper nutrients and vitamins. The sinusitis which appeared some weeks later among the poults, was due to the vitamin deficiencies. Hence, even if the pleadings had been broad enough to encompass a theory that disease involves not only infection but also low vitality and a deficiency in vitamins, if such a theory were tenable, plaintiff failed to prove that the poults were "diseased" when delivered or that defendants knew they were "diseased."

The proof that other purchasers of Sanders poults had high death losses that year, standing alone, does not warrant any conclusion that such poults were infected with a contagious disease when they left the hatchery. Any number of factors beyond the control of the hatchery might have accounted for the high death losses. It was admitted that weather conditions were unfavorable in May 1945. While plaintiff testified that he had thermostat controlled hovers in which the heat did not vary, on cross-examination it was disclosed that the general temperature in the brooder-houses was not so controlled; that there were two supplemental heaters; that it was wet and windy to an abnormal degree during the month; and that some death losses might have resulted from conditions other than infectious or contagious diseases.

Plaintiff failed to prove that the poults were infected with a contagious disease when delivered. Having failed to prove the existence of a contagious disease at the time of delivery, he failed to prove that defendants made a false representation that the poults were free from disease, and he consequently failed to prove that defendants made some statement with knowledge of its falsity or that defendants knew of conditions which would make such representation a reckless one. Mere proof that it was possible that the Sanders poults were infected with a contagious disease when they left the hatchery, was not sufficient to make out a prima facie case, since the source of the infection was not traced to the Sanders hatchery. This is highly significant in view of the fact that prior to delivery of these Sanders poults in May, there had existed on plaintiff's premises the very disease for which plaintiff sought to charge defendants with responsibility. It would be a matter of mere conjecture to conclude that the Sanders poults were infected when they left the hatchery.

The judgment of nonsuit must therefore be, and the same is hereby affirmed. Costs to respondents.

PRATT, WADE, WOLFE, and LATIMER, JJ., concur.