227 F.2d 629
 JUSTHEIM PETROLEUM COMPANY, a corporation, Appellant,
v.
Laurence HAMMOND and C. D. Flournoy and Milford Giffin, a partnership doing business as Flournoy and Giffin, Appellees.
Clarence I. JUSTHEIM, Appellant,
v.
Laurence HAMMOND and C. D. Flournoy and Milford Giffin, a partnership doing business as Flournoy and Giffin, Appellees.
 No. 5013.
 No. 5014.
 United States Court of Appeals Tenth Circuit.
 November 3, 1955.
 Rehearing Denied November 29, 1955.
 
 COPYRIGHT MATERIAL OMITTED Brigham E. Roberts, Salt Lake City, Utah (Calvin W. Rawlings, Harold E. Wallace, Wayne L. Black and J. Reed Tuft, Salt Lake City, Utah, on the brief), for appellants.
 George M. McMillan, Salt Lake City, Utah, for appellees.
 Before BRATTON, MURRAH and PICKETT, Circuit Judges.
 PICKETT, Circuit Judge.
 
 
 1
 This action has its source in a contract executed by the plaintiff Laurence Hammond and the defendants Justheim Petroleum Company and Clarence I. Justheim. The first cause of action is for damages caused by an alleged breach of contract by the company and Justheim. The second cause of action is for deceit on the part of the defendants Justheim Petroleum Company, Clarence I. Justheim, F. F. Hintze, Hugh J. Hintze and J. Darrell Nicodemus. The case was tried to a jury which found for the plaintiffs against only the company on both causes of action. The court upon motion entered a judgment notwithstanding the verdict against the defendant Clarence I. Justheim on the first cause of action.
 
 
 2
 On May 25, 1953, Hammond acquired a block of oil and gas leases in Dawes County, Nebraska, under an agreement requiring him to drill a test well. On July 4, 1953, the well was drilled to a depth of 2,632 feet, but Hammond was required to shut down drilling because of lack of finances. At this time, it was believed that granite would be reached at about 2,900 feet. In attempting to raise additional funds, Hammond negotiated with a man named Connor of Denver, Colorado, who came to the well site with F. F. Hintze, a geologist. Hintze made a rather detailed examination of the drilling reports and available geologic information including the surface geology. He talked to the drillers and two geologists, one of whom had written a report on the structure and the other of whom was in charge at the well. After this examination Connor and Hintze returned to Denver. On August 3, 1953, Hintze notified Hammond that Connor was unable to raise the necessary funds within the time required, and advised him that he believed that he had a source of money in Salt Lake City, Utah. Hintze was granted a five-day option upon terms which required a payment of $5,000 in cash and a contribution of $25,000 for past expenses in exchange for a fifty per cent interest in the well and leases. If the deal was consummated, Hintze understood that Connor was to receive one-half of the $5,000 for his part in the transaction.
 
 
 3
 Hintze immediately returned to Salt Lake City, and detailed information concerning the acreage and geological reports was sent to him there. During the next few days there was constant communication between Hammond and Hintze. Hintze advised Hammond that it appeared certain that the deal would go through and suggested that they make preparation to continue the drilling. On August 8, Hintze wired Hammond that the company wanted a Schlumberger electric log of the well. Upon receipt of this telegram, Hammond called Hintze, who identified his principals as Justheim or Justheim Petroleum Company. They were not in agreement as to the Schlumberger test and on August 9th, Hintze called Hammond and requested him to fly to Salt Lake City to complete the deal. Upon arrival in Salt Lake City, Hammond met with Hintze, H. G. Hintze, Justheim, and Nicodemus.[1] Justheim was president of Justheim Petroleum Company, and Nicodemus was secretary. F. F. Hintze was the managing geologist of the company and the holder of a substantial block of stock which had been given him for this service. Hintze advised Hammond that he had neglected to tell Justheim that the option required a $25,000 payment for past expenses and that if this sum were mentioned, the deal would probably fall through. At the beginning of the conference, Justheim appeared to know all about the transaction and asked no detailed questions. The negotiations started with the elimination of the $25,000 payment for a fifty per cent interest. The contract agreed upon, in addition to $5,000 in cash, provided that $12,500 should be paid for a seventy per cent interest, including a ten per cent interest which Hintze was to receive from Justheim and Justheim Petroleum Company. It was disclosed at that meeting that Connor was to receive one-half of the $5,000 as a commission.
 
 
 4
 Justheim was told that during the drilling operations, showings of oil had been encountered at the Lower Sundance, the Converse, and the Upper Minnelusa Sands. Hammond advised Justheim that he believed that there were three possible productive sands below the drilling, including the Leo Sand which had been quite productive in the Lance Creek Field in Eastern Wyoming.
 
 
 5
 Hammond demanded a written contract and Justheim stated that he could not remain at the meeting, but that Nicodemus had full power and authority to act for him, and he assured Hammond that what Nicodemus did would be satisfactory.[2] Justheim left and Hintze proceeded to type the contract in which Hammond was designated party of the first part, and Clarence I. Justheim and Justheim Petroleum Company were referred to as joint parties of the second part.[3] The contract required the payment of $5,000 upon its execution and the deposit of $12,500 in the First National Bank of Chadron, Nebraska in escrow with instructions to pay that sum to Hammond upon certification that the well had been deepened as required and an assignment of the oil and gas leases deposited. Hammond was obligated to deepen the well forthwith and continue with diligence until completed. He was also required to use his best efforts to obtain certain additional leases. The parties of the second part were to pay seventy per cent of the cost of a Schlumberger electric log and all other tests ordered by Justheim. The contract gave "full and complete power of supervision of the deepening operation" to Hintze, "the geologist of the second party". Justheim paid the $5,000 with his personal check. He testified that the company refunded the amount to him at a later date. Hammond returned immediately to Chadron, Nebraska, which was near the well, and shortly thereafter deposited the assignment of the leases with the bank as required by the contract. He also obtained the additional leases required by the contract. In the meantime, the drillers continued drilling and encountered granite.
 
 
 6
 Upon Hammond's arrival, he found that the drillers had encountered granite and called Hintze to get on the job immediately, which he did on August 11th. Hintze took charge of the activities at the well upon arrival. He ordered tests run to determine if there was commercial production in any of the different sands which had been encountered. After receiving a negative report of the test of the granite wash, he ordered the other possible zones of production to be tested and returned to Salt Lake City and discussed the matter with Justheim. Hammond was instructed by Justheim and Hintze to report to them by telephone the results of each test. When Hintze left, he took with him a sample from the drilling, which appeared to be saturated with oil. Hintze told Justheim that he believed they had an oil well. Justheim told others that he had acquired what appeared to be an oil well. In the meantime, Hammond left for Amarillo, Texas to acquire additional leases in the area.
 
 
 7
 After Hintze had all the information regarding the well, and after he had reported to Justheim, Hammond was notified that the $12,500 had been forwarded to the bank. A check drawn on the Justheim Petroleum Company was forwarded to the Chadron bank with instructions to deposit it to the credit of Clarence I. Justheim and J. Darrell Nicodemus. The bank was advised by letter that Justheim and Nicodemus would arrive shortly and would furnish instructions for the handling of the money. Within a few days, it was determined that there would be no production from the well. Justheim then notified Hammond by telegram that he was cancelling the contract, and he demanded the return of the $5,000. The reason given for the cancellation was that Hammond had represented "that the Leo Sand was ahead of the bit" when in fact the well log showed that the sand had been passed through when the contract was made. In demanding the return of the $5,000 he referred to it as "my money".
 
 
 8
 The defendants first contend that even though Hintze was acting as agent for the company and Justheim, they were entitled to a directed verdict upon the first cause of action because Hammond admitted that he paid Hintze $2,200 of the $5,000 for his services in obtaining the contract. This contention is predicated upon the rule that knowledge and acts of an agent acting adversely to his principal and in collusion with another to cheat and defraud the principal, will not be imputed to the principal for the benefit of one who participates. Powerine Co. v. Russell's, Inc., 103 Utah 441, 135 P.2d 906; Herdan v. Hanson, 182 Cal. 538, 189 P. 440. However, any money received by Hintze was not from Hammond, but according to Hintze's own testimony, it was from Connor. The money was delivered to Hintze for Connor, and Hintze accounted to Connor for it. This accounting included a division of a portion of the $2,200, the settlement of a debt due Hintze from Connor, and the payment of some expenses. It was known to the parties during the discussions preceding the contract that Connor would receive a portion of the $5,000, and that Hintze would receive a ten per cent interest which the contract provided was to be taken from the seventy per cent interest of Justheim and the company.
 
 
 9
 In addition, this question was presented for the first time on appeal. The rules provide that affirmative defenses must be pleaded and proved, and that a party waives all defenses and obligations which he does not present either by motion or in his answer or reply. Fed.Rules Civ.Proc. rules 8(c) and 12 (h), 28 U.S.C.A.; Liberty Petroleum Co. v. California Co., 10 Cir., 114 F.2d 980. It is settled that issues which are not raised and presented to the trial court will not be considered on appeal. Walters v. City of St. Louis, Mo., 347 U.S. 231, 74 S.Ct. 505, 98 L.Ed. 660; Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037; Brown v. American Nat. Bank, 10 Cir., 197 F.2d 911; Denver & R. G. W. R. Co. v. Himonas, 10 Cir., 190 F.2d 1012; State ex rel. Williams v. Neustadt, 10 Cir., 149 F.2d 143; National Fire Insurance Co. of Hartford, Conn. v. School Dist. No. 68, 10 Cir., 115 F.2d 232.
 
 
 10
 The court instructed the jury that "There are five elements in the concept of fraud and in order to find that there was fraud which induced the defendants to enter into this contract, you must find the existence of all five of those elements. There must be a misrepresentation; second, of a material fact; third, made with the intent to deceive; fourth, upon which the defendants relied; fifth, to their detriment. * * * There is no fraud, ladies and gentlemen, unless you also find the intent to deceive upon the part of Laurence Hammond. Unless you find that Hammond intended to deceive Justheim Petroleum Company and Clarence I. Justheim, an individual, you cannot find for the Justheims in this defense." The instruction is a correct statement of the law of fraud. Adamson v. Brockbank, 112 Utah 52, 185 P.2d 264; Oberg v. Sanders, 111 Utah 507, 184 P.2d 229; Nielson v. Leamington Mines & Exploration Corporation, 87 Utah 69, 48 P.2d 439; Campbell v. Zion's Co-Op. Home Building & Real Estate Co., 46 Utah 1, 148 P. 401; Southern Development Co. v. Silva, 125 U.S. 247, 8 S.Ct. 881, 31 L.Ed. 678.
 
 
 11
 The defendants argue that this instruction is prejudicial to them because under the evidence the contract may have been entered into as a result of an innocent misrepresentation which would afford ground for cancellation of the contract in the absence of deceit. The evidence relied upon is that which pertains to the location of the Leo Sand. The defendants contend that the contract was executed because of Hammond's representations that the Leo Sand was still below the drilling bit and that this would be grounds for rescinding the contract even if the representation was innocent. Hammond testified that he advised the defendants that he believed that the Leo Sand lay below the bit and might prove productive. The well log did not show that this sand had been passed through. Dr. Glen M. Ruby, an eminent geologist, testified that according to the well logs and reports the Pahasapa Limestone was reached at about 2,400 feet and that the Leo Sand, if it were to be found in that area, would be above the Pahasapa Limestone. The testimony of Dr. Ruby also indicates that the Leo Sand is not constant in the locality but may pinch out[4] and that there were three sands shown to be between the top of the Minnelusa and the Pahasapa Limestone. As nearly as he could say, they were the Converse, the Leo, and the Bell Sand. The evidence indicates that the location or existence of the Leo Sand is rather nebulous. Hammond believed that it had not been reached and so stated. A representation which is a mere expression of an opinion is not actionable. Stuck v. Delta Land & Water Co., 63 Utah 495, 227 P. 791. The question of whether he made these statements as an absolute fact or as an expression of opinion was properly submitted to the jury.[5] It is impossible for any one, including experts, to speak with certainty as to what may be found during the drilling of a wildcat oil well. Justheim and his geologist were at least as competent to judge what lay ahead in the well, as was Hammond. Southern Development Co. v. Silva, supra; Gordon v. Butler, 105 U.S. 553, 26 L.Ed. 1166. The circumstances of this case are not such that the rule permitting the rescission of a contract because of a mutual mistake or an innocent misrepresentation, may be invoked. The Leo Sand is peculiar to the Lance Creek Field in Eastern Wyoming and no one, including geologists, know that it will be found or be productive elsewhere. The existence and the productiveness of the Leo Sand was a chance which Justheim and the company took when they executed the contract, and the circumstances were such that a question of fact was presented as to whether the defendants were justified in relying on Hammond's representations as to the location or existence of the sand. Adamson v. Brockbank, supra. The value of that risk, together with the possibility of production in other sands, was agreed upon after considerable negotiations and after all the information which Hammond had was made available to the defendants.
 
 
 12
 The defendants offered instructions upon this subject, but exceptions to the failure to give them were not made after the court had instructed the jury, and the refusal to give the instructions cannot be urged on appeal. Jones v. Koma, Inc., 10 Cir., 218 F.2d 530.
 
 
 13
 Furthermore, we think it is quite clear that there was sufficient evidence for the jury to conclude that the defendants did not rely upon Hammond's representations when the contract was executed, and this issue was submitted to the jury. Hammond was a novice in the oil business and a total stranger to the defendants. Justheim was an experienced mining engineer and metallurgist. His experience in the oil business is not shown, except that he was president of the defendant company and had drilled a number of oil wells. He appeared to be quite familiar with the business of oil well drilling. Hintze was known to be an experienced geologist of many years in the business and was the company's managing geologist. Justheim testified in a deposition that he "was going on the recommendation of Dr. Hintze" and there were ample circumstances to indicate this was true. Hintze had told him the night before the conference at which the contract was executed that the well had good possibilities.[6] If the defendants did not rely on the representations of Hammond, they were not prejudiced by the failure to instruct on the issue of innocent misrepresentations. 37 C.J.S., Fraud, § 29; 23 Am.Jur., Fraud and Deceit, Sec. 141; Oberg v. Sanders, supra; Johnson v. Allen, 108 Utah 148, 158 P. 2d 134, 159 A.L.R. 256; Stuck v. Delta Land & Water Co., supra; Hecht v. Metzler, 14 Utah 408, 48 P. 37.[7]
 
 
 14
 It also appears that when Hintze, acting under the terms of the contract, went to the well location after it had been drilled to granite, he thereafter knew all the facts about the condition of the well. He knew the well was bottomed; he knew that if the Leo Sand was present, it had been passed; he knew when the last drilling started; he had a complete well log and an electric log; and he had all the other available data about the well. In fact, he had all the information about which the defendants complain they had no knowledge. Shortly thereafter, Justheim learned from Hintze and Hammond that granite had been reached, and that if the Leo Sand was in that area, it had been passed through. Yet he did not attempt to rescind the contract at that time. Instead, he relied upon Hintze's statement that he believed that producing sands had been encountered during the drilling and that he had ordered drillstem tests to be made at those zones. Justheim then forwarded the money to the Chadron bank and notified Hammond in Amarillo, Texas, who was there obtaining additional leases, that the money had been forwarded to the bank.[8] The defendants attempted to retain their rights under the contract until after they knew that there would be no commercial production. If oil had been found in any of the sands, Justheim and his company would have owned seventy per cent of the well and leases. Where parties have the right to rescind, they cannot delay the exercise of that right to determine whether avoidance or affirmance will be more profitable to them. This is particularly true where the transaction is one of a speculative nature. Restatement of Contracts, Vol. 2, Secs. 483, 484; 12 C.J.S., Cancellation of Instruments, § 44; Frailey v. McGarry, 116 Utah 504, 211 P.2d 840; Taylor v. Moore, 87 Utah 493, 51 P.2d 222; Le Vine v. Whitehouse, 37 Utah 260, 109 P. 2; Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 23 L.Ed. 328.
 
 
 15
 The court instructed the jury that one of the issues was whether the information given to Hintze on his first trip to the well was attributable to the defendant Justheim or the company. The jury was told that in considering whether Hintze was the agent of the defendants on that date, it should take into consideration the nature of the relationship between Hintze and the defendants; the amount and degree of control, if any, which the defendants had and did in fact exercise over Hintze; the past relationship of the parties; and the fact that he was held out to the public as their managing geologist. The defendants objected to this instruction upon the ground that the evidence showed that on that date Hintze was the agent of Connor and not the agent of the defendants. A careful examination of the evidence discloses that the facts and circumstances are sufficient to sustain the inference that Hintze was acting for the company as its managing geologist throughout all of the negotiations. It is true that Connor was trying to find some one who would give financial help to Hammond and that he expected to be paid for it. He knew that Hintze was associated with Salt Lake City interests which might be interested. If Hintze acted in good faith, and there is no evidence here that he did not, he might well have acted in a dual capacity. There were no adverse interests between the defendants and Connor, and it was known to Justheim that Connor was to be paid and that Hintze was to have an interest in the well and lease. 3 C.J.S., Agency, § 271; Latses v. Nick Floor, Inc., 99 Utah 214, 104 P.2d 619; Newsom v. Watson, 198 Okl. 220, 177 P.2d 109; Maryland Casualty Co. of Baltimore, Md. v. Queenan, 10 Cir., 89 F.2d 155.
 
 
 16
 In addition, the instruction is not prejudicial to the defendants because under the terms of the contract, Hintze became their agent and thereafter obtained all the available information about the well and reported to Justheim. As hereinbefore stated, the defendants later knew all the facts and still did not elect to rescind the contract until it became definitely known that the well was a failure.
 
 
 17
 In the first cause of action, Hammond claimed damages of $12,500 and seventy per cent of the additional expenditures for testing the well after the contract was signed, which amounted to $3,136.50, together with the value of adjacent oil and gas leases in the sum of $14,800. The jury was instructed that the measure of damages in this kind of an action was the amount which the defendants had agreed to pay and any other damages which were the natural and probable result of a breach of contract. It is urged that this instruction was erroneous because the proper measure of damages should have been the difference between the contract price and the market value of the leases at the time of the breach. Although this may be the rule in an action at law to recover damages for the breach of a contract, it has no application here.[9] The theory of plaintiffs' case was that Hammond had fully performed the contract by completing the well, acquiring additional leases, and depositing an assignment of the leases in escrow as required by the contract and therefore was entitled to the contract price. No issue as to the value in the leases after the failure to deposit the $12,500 was in the case. From the record it appears that both parties assumed that the leases had no value after the defendants' breach and abandonment of the well.[10] The case was tried on this theory, and apparently the jury adopted that view. Assuming that Hammond could not retain valuable leases and at the same time recover the full contract price, there is no evidence upon which a jury could compute the difference. We therefore conclude that even though the instruction given by the court was not a correct statement of the general law on the subject, it was not prejudicial in this case.
 
 
 18
 The second cause of action is in deceit based on the theory that the defendants entered into a contract with the plaintiffs representing at the time that they intended to perform the contract, when as a matter of fact, they did not intend to perform, and intended to deceive the plaintiffs. To sustain an action of this nature, it must be shown that there was an intention on the part of the defendants at the time of the execution of the contract that they did not intend to perform it. Such fraudulent intent is not usually susceptible of direct proof and may be established by circumstances. It may not, however, be inferred alone from the fact of nonperformance of the contract. A lawful inference of such deceitful intent may be drawn only from established facts. 3 Restatement, Torts, Section 530; 24 Am.Jur., Fraud and Deceit, Section 263; Annotation 125 A.L. R. 1306; Oberg v. Sanders, supra; Adamson v. Brockbank, supra; Nielson v. Leamington Mines & Exploration Corporation, 87 Utah 69, 48 P.2d 439; Hull v. Flinders, 83 Utah 158, 27 P.2d 56.
 
 
 19
 We think there is a total lack of evidence of bad faith or lack of intent to perform, on the part of the defendants at the time of the execution of the contract. While there was some conduct on the part of Justheim and Hintze which would indicate that they knew more about the facts under consideration than they professed to know, it is quite obvious that this was for the purpose of negotiating over the purchase price. There is no evidence that the defendants did not intend to fully perform the conditions of the contract at the time of its execution. It was not until it became known that the well had been drilled to granite that the defendants looked for a way to retain their interest in the well and leases, and at the same time protect themselves against the loss of the $12,500 if there was a total failure. Upon the execution of the contract, the $5,000 was paid to Hammond, and Hintze proceeded to the well immediately and took charge of the drilling operations. He ordered a test of the granite wash and of the other zones which might be productive. The defendants did everything required of them until it became known that the well might not be productive. This is not a circumstance from which an inference may be drawn that the defendants did not intend to perform at the time they executed the contract. We therefore conclude that the court should have directed a verdict for the defendants on the second cause of action.
 
 
 20
 Finally, it is contended that the court erred in entering judgment against Justheim notwithstanding the verdict in his favor. When the contract was drafted Justheim was made a party. Nicodemus signed for Justheim as attorney in fact. Justheim testified that Nicodemus only had authority to sign for the corporation. Nicodemus stated that in signing the contract, he intended only to bind the corporation. The evidence was sufficient to sustain a finding that Nicodemus was without authority to sign for Justheim personally. Justheim could therefore refuse to be bound upon discovery that an unauthorized agent had made him a party to the contract. This right, however, is one which may be waived. 2 Am.Jur., Agency, Section 209. The evidence is without conflict that after Justheim had read the contract and knew that he was a party to it, he did not disaffirm it but elected to be bound. He forwarded money to the Chadron bank and notified Hammond that the money was forwarded as "per contract". In his personal telegrams of August 17 and 18th, Justheim mentioned only the misrepresentations as to the location of the Leo Sand as a ground for rescission. He did not at any time claim that he was not personally obligated under the contract because of an unauthorized signature. The August 17th telegram clearly discloses that he considered it a personal obligation.[11] It is well established that where a person without authority assumes to act as the agent of another who later affirms or adopts what has been done, the latter is bound to the same extent as though authority had been given in the first instance. Restatement of Agency, Sections 82, 100; Jones v. Mutual Creamery Co., 81 Utah 223, 17 P.2d 256, 85 A.L.R. 908; United States Bond & Finance Corp. v. National Building & Loan Ass'n of America, 80 Utah 62, 12 P.2d 758, 17 P.2d 238; Burnham v. Layton, 10 Cir., 209 F.2d 237.
 
 
 21
 Judgment on the second cause of action is reversed with instructions to enter judgment for the defendants. Judgment on the first cause of action is affirmed.
 
 
 
 Notes:
 
 
 [1]
 H. G. Hintze was the son of F. F. Hintze and was attorney for the company. Justheim, Nicodemus and H. G. Hintze were directors of the company
 
 
 [2]
 Hammond testified as follows:
 "I asked him how could we sign the contract if he as principal was not there and he said to me, putting his hand on Mr. Nicodemus `J. Darrell Nicodemus has my power of attorney. Anything he signs is as if I signed it personally' and I said `Is that an actual fact and I have your assurance of that?' and he said `You do, and if you wish to have written proof, I will see it is provided' and I said `I don't think that is necessary, though I would like to see it' and Mr. Justheim left at that time."
 
 
 [3]
 The plaintiffs Flournoy and Giffin were the drilling contractors and have an interest in the contract through an assignment from Hammond
 
 
 [4]
 In answer to an interrogatory relating to the representation as to the location of the Leo Sand, the defendants stated that "* * * it may be that the Leo Sands were not present at the well site."
 
 
 [5]
 "You are instructed, ladies and gentlemen of the jury, that expressions of opinion as distinguished from statements of fact cannot form the basis for avoiding a contract upon the ground of fraud. The second essential element; namely, a misrepresentation of a material fact, would not be present in such a case. In the present case it is for you to decide whether the statements in question were expressions of opinion only or were statements of fact. The question you should ask yourselves is: Were the statements claimed to have been made by Hammond merely expressions of the judgment, opinion or belief of the plaintiff Hammond or did he state the matter as a positive fact based upon knowledge."
 
 
 [6]
 The evidence shows that after an examination, Hintze stated that "rarely in his life [had he] seen so much structure in one area"
 
 
 [7]
 In Johnson v. Allen, the Supreme Court of Utah said [108 Utah 148, 158 P.2d 137]:
 "It is fundamental that before any one can have relief from a claimed fraud he must show not only that he relied on the misrepresentation but also that he had the right to rely on it."
 
 
 [8]
 This notification was by telegram which read:
 "Lawrence Hammond
 "Care Atkins and Atkins Attorneys at Law
 "Amarillo Tex
 "$12,500 forwarded by wire to Chadron Bank as per contract
 "Clarence Justheim Justheim
 Petroleum Co."
 
 
 [9]
 Generally speaking, the measure of damages for breach of an executory contract to purchase real property or an interest therein, is the difference between the contract price and the market value of the land at the time of the breach. 55 Am.Jur., Vendor and Purchaser, Sec. 524; Perkins v. Spencer, Utah, 243 P.2d 446; Malmberg v. Baugh, 62 Utah 331, 218 P. 975; Dopp v. Richards, 43 Utah 332, 135 P. 98
 
 
 [10]
 For the purpose of sustaining his claim to damages for the loss in value of certain leases, Hammond offered proof that prior to the breach the leases had a value of $4 or $5 an acre. This was not proof that the leases had such value after the breach and abandonment of the well
 
 
 [11]
 "Exhibit 24 — Telegram dated August 17, 1953, Clarence I. Justheim to Laurence Hammond
 "`You represented to me in Dr. Hintze's office that the Leo Sand was ahead of the bit. On this statement by you I gave you five thousand dollars. Two days later when Dr. Hintze went to Chadron your geologist produced the strip log of the well which showed you had passed thru the Leo Sand before you came to see us. Accordingly you received money from me by misrepresentation and therefore demand the return of my money.'"