398 P.2d 882

**MOLLERUP VAN LINES, a corporation, and Liberty Mutual Insurance Company, a corporation, Plaintiffs,**

v.

**Tyven ADAMS, Wasatch Construction Company, The State Insurance Fund, and The Industrial Commission of Utah, Defendants.**

No. 10101.

Supreme Court of Utah.

Feb. 8, 1965.

1. 3 Utah 2d 175, 280 P.2d 974 (1955).

John H. Snow, Skeen, Worsley, Snow & Christensen, Salt Lake City, for plaintiff.

A. Pratt Kesler, Atty. Gen., Pugsley, Hayes, Rampton & Watkiss, Salt Lake City, for defendants.

CROCKETT, Justice:

Mollerup Van Lines and its insurer, Liberty Mutual Insurance Company, seek reversal of a supplemental order in favor of Tyven Adams for workmen's compensation and surgery for his injured back.

It is not disputed that the applicant Adams suffered an accidental injury while working for Mollerup. In attempting to lift a truck wheel on to its axle, he slipped and something "popped" in his back, causing him to fall to the ground. Subsequently, upon a hearing before the Commission, and on the basis of the report of a medical advisory board, he was given a lump sum payment of $374.50 for permanent disability of 5% loss of bodily function.

The condition of Mr. Adams' back later became so bad that he was unable to work, and his doctor recommended surgery. He filed an application for workmen's compensation against his subsequent employer, Wasatch Construction Company.. At the hearing on this application, when the evidence seemed to indicate that his condition and disability was really attributable to the Mollerup accident, the Commission ordered that Mollerup and its insurer, Liberty Mutual, be brought in as parties, which was done. At the further hearing, upon being

questioned why he had not had the necessary operation to fix his back, he responded that he had been waiting for "this insurance." Upon the basis of the evidence and the medical panel report, the Commission found that the condition of his back was the result of the Mollerup injury. It ordered that the plaintiff pay Mr. Adams "temporary total disability from January, 1963, until he is released by his physician," and that he be proffered the necessary surgery. It is this supplemental order which the plaintiffs attack.

■■ The ordinary rule of res judicata is not applicable to the instant proceeding. Inherent in the act is recognition that industrial injuries cannot always be diagnosed with absolute accuracy, nor their consequences predicted with complete certainty. Section 35–1–78, U.C.A.1953 provides that "the powers and jurisdiction of the Commission over each case shall be continuing, and it may from time to time make such modification or change with respect to former findings, or others with respect thereto, as in its opinion may be justified." Accordingly, even though the Commission has made an award, if there later develops some substantial change or new development with respect to the injury than was known or was contemplated at the time of the original award, upon proper proceedings the Commission can make such adjustment as is just and reasonable and in conformity with the act.[1]

The difficulty which confronted the Commission, and which has now come to us, is that the applicant Adams has had two injuries to his back since the Mollerup accident. One while working at the Iverson Service Station in lifting a battery; and the other while working for the Wasatch Construction Company when he fell off the tongue of a scraper. It is the plaintiffs' contention that the applicant's present disability is attributable to these later accidents rather than to the Mollerup incident as found by the Commission. Whether it could have found that either or both of the subsequent injuries were the cause of his present condition and disability, is not our concern.

■ The question of critical and controlling importance is whether there is a reasonable basis in the evidence to support the finding that his disability resulted from the Mollerup incident. In addition to the testimony of the applicant himself, which tends to provide a factual basis supporting the decision, there is the report of the medical panel.

Pursuant to Section 35–1–77, U.C.A.1953, the Commission appointed the panel, consisting of Dr. Boyd G. Holbrook, Chair-

1. See Salt Lake City v. Industrial Commission, 61 Utah 514, 215 P. 1047; Spencer v. Industrial Commission, 4 Utah 2d 185, 290 P.2d 692.

man, Dr. S. W. Allred, and Dr. L. N. Osmond. The panel report stated the conclusion that:

> This man's present condition represents a continuation of the injury of April 9, 1958, [The Mollerup incident] *and the subsequent minor accidents have not been significant* in the overall progress of his condition since that injury.

It is true that under the provisions of that section when the report is challenged it "shall not be considered as evidence in the case except insofar as it is sustained by the testimony admitted." It therefore becomes essential to determine whether the testimony of Dr. Holbrook "sustained" the medical panel report or repudiated it. On that question the following excerpts are pertinent:

"BY MR. PUGSLEY: (Counsel for Mr. Adams)

"Q. Dr. Holbrook, your panel was aware of the 1958 [Mollerup] and the 1960 [Iverson] injuries as well as the 1962 [Wasatch] injury at the time of your examination of Mr. Adams, was it not?

"A. Yes.

"Q. And you were also aware of this apparent arthritic spurring that showed in the later X-rays when you made the examination?

"A. Yes.

"Q. Now notwithstanding that awareness, etc., the conclusions that are shown on the last page of the panel's report, particularly No. 1: *'This man's present condition represents a continuation of the injury of April 9, 1958'* was made by you?

"A. That's correct.

"Q. You referred to: *'That subsequent minor accidents have not been significant.' Was that the conclusion of all of the participants in the panel?*

"A. *It was.*

"MR. PUGSLEY: I believe that's all.

"BY MR. SNOW: (Counsel for Mollerup and Liberty Mutual)

"Q. All right. Are you trying now to say that *if this man had had no incident at Mick Iverson's,* and had been going about a job we'll say as sedentary as mine, *and had had no injury at Wasatch,* where he went off the Caterpillar, are you saying to us now that this man would today be in the same condition that he now is, after having had these injuries?

"A. I would say that he most likely would be in similar condition. I can't say for sure that it would be the same. But this is a degenerative process that has been slowly progressing. His condition has been gradually getting worse both radio-graphically and symptomatically, *and this would have happened,*—in

the opinion of the panel—*irrespective of these two occurrences.*"

It will be noted from the context that "these two occurrences" refer to the incidents at Iverson's Service Station and The Wasatch Construction Company. It is but fair to concede that on cross-examination the doctor did admit that the subsequent accidents presented some *difficulty* in determining the cause of the applicant's disability. However, even though he admitted this difficulty, he did not say that it was *impossible.*

 In appraising the effect of this evidence, it is well to keep in mind that this proceeding is different from an ordinary lawsuit in that it is not an adversary proceeding. It is purposed to be an impartial inquiry as to whether the applicant is eligible for workmen's compensation. This is especially so as to the panel report and the testimony of Dr. Holbrook, both of which resulted from appointment by the Commission to make an independent investigation and report for its guidance. Therefore, neither party is necessarily bound by any statement or admission made either in the report, or in the testimony of

the doctor. It was both the duty and the prerogative of the Commission to view his entire testimony together and it could believe those statements which impressed it as being true,[2] even though there may have been some seeming contradictions in other parts of his testimony.[3] It is our opinion that this testimony looked at in that light could reasonably be regarded by the Commission as sustaining the report of the medical panel, which in turn justifies the decision.

 We are sensitive of the fact that due to the continuing jurisdiction of the Commission as above set forth, there is danger of unfairness and injustice in imposing liability upon an employer for a supplemental award based upon a prior injury such as this. The only safeguard against this danger is the prudence and caution of the Commission, which we fully agree should be exercised to a high degree in regard to such situations. Nevertheless, it is firmly established that the Commission has the exclusive prerogative of judging the credibility of the witnesses, appraising the evidence and finding the facts, which must not be disturbed if there is a reasonable basis therein to support them, as we

2. See Jaffe, Judicial Review: Question of Fact, 69 Harv.L.Rev. 1020, 1025–31, 1039–52 (1956); 2 Davis, Administrative Law Treatise, § 14.13 (1958).
3. See McGrady v. Brink, 195 Wash. 626, 629, 81 P.2d 800, 802 (1938); Kaltenheuser v. Sesker, 121 N.W.2d 672, 676

(Iowa 1963); Gillick v. Fruin-Colnon Constr. Co., 334 Mo. 135, 65 S.W.2d 927 (1933); Neff v. Pennsylvania R. Co., 173 F.2d 931, 932 (3d Cir. 1949); see, in general, 32 C.J.S. Evidence § 571, p. 662, n. 23 (1964) (citing cases).

have concluded exists here.[4] (All emphasis added)

The award is affirmed. Costs to defendants.

McDONOUGH and WADE, JJ., concur.

HENRIOD, Chief Justice (dissenting):

Applicant, Tyven Adams, has suffered three industrial accidents: 1) While working for Mollerup in 1958, lifting a truck wheel, he slipped and fell and something "popped" in his back, which troubled him somewhat, but did not prevent him from working thereafter. The Commission ordered Mollerup's insurance carrier to pay $374.50 compensation for a *"permanent disability amounting to 5% loss of bodily function,"*—a fact found by a medical panel appointed by the Commission under statutory authority.[1] Thereafter, and before the second accident, he worked at Kennecott Copper and Flaming Gorge Dam, performing equally strenuous work as a heavy equipment operator, without "any trouble to speak of," being "able to do anything I wanted to," and without any physically disabling incident.

2) Later while working at a gas station operated by one Iverson, installing a battery, he suffered an injury to his back, requiring chiropractic and other medical treatment. His testimony rather clearly pointed up the fact that until the Iverson incident, nothing bothered him much, but that thereafter he could not pursue the type of work in which he had been engaged, so he sought lighter work as proprietor of his own service station. He made application for compensation as a result of injuries *while working at Iverson's,* and benefits were paid on his behalf by the State Insurance Fund of approximately $100, for an injury resulting from his employment with Iverson. In the settlement no claim was made by the Insurance Fund that the incident was any natural outgrowth of the Mollerup injury. This, even though the file in the Iverson case discloses that he had suffered an industrial accident two years before.

3) After leaving his service station, he went to work for Wasatch in 1962 as an equipment operator and sustained a back injury in October, 1962, when a cable which he was tugging came loose and in losing his balance, he fell from the equipment, sustaining a "kink" in his back.

Adams, through his employer, applied for compensation for this last injury, and the Commission, after a couple of hearings, concluded that such injury was the result, causationwise and progressively of the Mollerup injury.

4. See Kent v. Industrial Commission, 89 Utah 381, 57 P.2d 724.

1. Title 35-1-77, Utah Code Annotated 1953.

242

Aware of the rules with respect to appellate review favoring the Commission's orders if supported by conceded or controverted evidence, I cannot see how the Commission can be sustained on the evidence because:[2]

In the Mollerup hearing involving the 1958 incident, the conclusion of the medical panel, without controversion, and sustained by the Commission, was that Adams had sustained an injury that resulted in a "permanent disability amounting to 5% loss of bodily function." No suggestion was made that this condition would be accentuated by progressive exposure. At best it was a prognosis of permanency without malignancy, and the presumption is that this static condition would persist.

This condition in fact appears to have persisted. The second, or Iverson incident was treated by the Commission and the Insurance Fund as one that was consistent with such conclusion, by its paying off on a claim *for an independent injury* occurring while Adams was employed by Iverson.

The Insurance Fund, for the first time, asserted a causal connection with the Mollerup incident, in the hearing with respect to the last incident, relating to Adams' employment with Wasatch. This was quite inconsistent with its previous position in the Iverson injury.

Nonetheless, in the Wasatch hearing there was a medical advisory board's conclusion that Adams' condition was a result of the Mollerup incident, and that subsequent events were insignificant in the overall progress of Adams' condition. This conclusion was contested by Mollerup in the Wasatch hearing. Although the medical panel in the latter case detoured from that of the former panel, it is necessary to consider the latter in light of the former decision in this case.

It is difficult to understand how the panel or anyone else could say at this point, without tongue in cheek, that the applicant would have had to go to a chiropractor at the time of the Iverson battery lugging incident had it not occurred. The fallacy of the whole thing is that illogically it is concluded that an independent industrial accident, unrelated to deterioration, does not affect the result of the previous injury. The third industrial incident emphasizes the error since there is absolutely no reason reflected in the record to believe that if the applicant had not slipped on Wasatch's tongue, that at that time he would have required surgery.

Had the medical panel in the Mollerup case said the applicant had a "5% temporary" ailment, subject to future disability, that is one thing. For the panel in the Wasatch case to say or imply that the

2. Burton v. Ind. Comm., 13 Utah 2d 353, 374 P.2d 439 (1963).

panel in the Mollerup case was in error lends substance to a conclusion that the first panel report, which was unassailed, should pre-empt that of the second, which *was* assailed, punctuated with an admission by the chairman of the latter on cross-examination, that it was difficult to determine which of the three incidents had greater "pushing down" effect,—hence which one was the real cause of the last disablement. "The testimony of a witness is no stronger than where it is left on cross-examination." [3]

In the present case there was a conclusion that the Wasatch injury was of no consequence in its relation to the Mollerup incident. Under our statute, the panel's conclusion would be evidence, if not countered. In the instant case the chairman of the panel testified on direct and cross-examination. Although confirming on direct examination the panel's conclusion, in effect he admitted on cross-examination that he could not attribute to a pre-existent ailment, (the 1958 Mollerup incident), the Iverson incident, or the Wasatch incident; as the causa causans of the last injury. Under the statute [4] the medical panel report is not considered evidence if called to account, but only an exhibit, which must be supported by the evidence. The chairman's testimony departed from the report and did not support it. He could not attribute the cause precisely to that determined by the panel. This being so, the Commission really had nothing before it definitely to ignore the Wasatch incident. So, it seems that, from the evidence, no conclusion could be reached to support the Commission's findings that Mollerup, employer four years before, was responsible in the workmen's compensation sense.

The main opinion dismembers itself when it admits that "the applicant has had two injuries to his back since the Mollerup accident." I take it this means two industrial accidents unrelated to the Mollerup accident, in which event no kind of reasoning could justify the conclusion that but for those two accidents the applicant would have required medication at the time of each, had either not occurred. In attempting to avoid the quoted language the main opinion relies on the medical report, which, as has been pointed out hereinabove, was shattered by a cross-examination firecracker. It is no answer to say, as does the main opinion, that it is of critical importance to determine if Dr. Holbrook's testimony "sustained" the medical report; when obviously it didn't, and the labored quotation of part of Dr. Holbrook's examination lifts out of context testimony that does not take into account the pronouncement of Oberg v. Sanders, supra, that "the testimony of a witness is no

3. Oberg v. Sanders, 111 Utah 507, 184 P.2d 229 (1947).

4. Title 35-1-77, Utah Code Annotated 1953.

stronger than where it is left on cross-examination."

On cross-examination, Dr. Holbrook conceded that he did not know which of the three incidents "pushed down" the so-called progressive deterioration. The medical panel in the 1958 Mollerup case, where the claim was settled and accepted, based on the panel report, completely negated any idea of progressive deterioration by concluding that there was only a 5% permanent static condition.

The main opinion's generalization that the Commission has the prerogative of judging the credibility of witnesses is Hornbook, but its prerogativity does not extend to the luxury of concluding that a witness is credible as to one phase of his testimony, when another phase thereof represents its antithesis.

I am of the opinion that the Insurance Fund, having paid off the second claim on the theory that it was not related to the first accident, and that the facts and admissions in this case are unresponsive to any claim that the 1958 Mollerup incident was solely the cause of the disablement, which should impel an order requiring Wasatch and/or the Insurance Fund to accept responsibility for the applicant's injury.

As a postscript this writer wonders what the conclusion of the Commission, others and this court would have been had Mollerup gone bankrupt and its insurer had become insolvent before the applicant was injured while employed by Wasatch.

CALLISTER, Justice (dissenting):

I concur with the views set forth in the dissenting opinion of Chief Justice Henriod. However, I would like to make a further observation. In my opinion, plaintiffs' argument with respect to the Commission's jurisdiction to make an award against them in this proceeding is meritorious. This was a claim against Wasatch—not against plaintiffs. If the Commission was to exercise its continuing jurisdiction over the Mollerup injury, that case should have been reopened and the claimant required to prove some change or new development in the injury not known to the parties at the time the award was made.[1]

1. Salt Lake City v. Industrial Commission, 61 Utah 514, 215 P. 1047 (1923).